SUPERVISOR AND COMMISSIONERS OF PICKENS COUNTY, S. C., AND SUPERVISOR AND COMMISSIONERS OF OCONEE COUNTY, S. C., v. E. H. JENNINGS.

(Filed 18 May, 1921.)

**1. Negligence—Act of God—Waters—Floods—Dams—Contributing Cause.**

Where there is evidence tending to show that a lower proprietor on a stream has caused damage to his property by the breaking of the defendant's dam through his negligence, and, *per contra*, that it was caused by an unprecedented fall of rain in that locality, not to have been reasonably anticipated, the question of the defendant's liability is not whether the negligence of the defendant alone, without the aid of the flood, was insufficient to have caused the break in the dam and the resultant damage, but whether it contributed as a factor in producing it.

**2. Same—Concurrent Negligence—Proximate Cause.**

Where the act of God would not have produced damage to the plaintiff's property except for the concurrent negligence of the defendant, this negligence is considered as the proximate cause of the injury, which will hold the defendant liable for the damages sustained.

**3. Appeal and Error—Instructions—Conflicting Constructions—Reversible Error.**

Where parts of the instructions given by the court are materially in conflict, the jury is left in doubt as to the law applicable to the case, and it constitutes reversible error.

**4. Negligence—Ordinary Care—Rule of the Prudent Man—Distinctions.**

The law as to what constitutes negligence is but the want of ordinary care, which is that degree of care that a man of ordinary prudence would use under the same or similar circumstances, the care in the particular case being proportionate to the danger, and not requiring that any particularizing distinction be drawn between its various degrees, or between negligence and gross negligence, in the instruction of the court.

**5. Evidence— Appeal and Error— Negligence— Act of God— Floods— Waters.**

Where the defendant is sued for damages for the negligent breaking of his dam, and there is evidence that it was caused by the act of God, testimony as to the rainfall in other localities not situated or connected with the same locality and watershed, is incompetent.

APPEAL by plaintiffs from *Long, J.,* at the Special October Term, 1920, of TRANSYLVANIA.

It is well in a case of this kind to so state the facts as to present alternatively the contentions of the parties, with such reference to the testimony as will serve to give a clear conception of them, and substantially using their language.

### PLAINTIFFS' CONTENTION.

In 1902-1903 the Toxaway Company, a corporation, in which corporation the defendant was a stockholder, a director and vice president, built a dam 500 feet in length, approximately 60 feet in height, 260 feet at the base, with a crown of 26 feet, across the Toxaway River, which flows into Keowee River in South Carolina. This dam confined a body of water covering more than 640 acres, and varied in depth from 10 to 50 feet, and was more than 3,000 feet above sea level. The dam was built near the top of a rapidly declining shoal, and on a rock foundation. It was what is known as an earthen dam; it had no rock or cement core, and only had a small stone wall about 3 feet in width and 3 feet high, extending along a part of the foundation from about 75 feet on west side of stream to about same distance on east side of stream.

In stripping the rock foundation of growth and natural earth, an overhanging ledge of rock was found. It was along this ledge that one of the outflows of the dam first appeared, and where one of the breaks first occurred when the dam went out. This ledge was not removed, but remains today. No flood-gate or drain-gate was installed by which to let down the water in the lake if repairs should become necessary. During construction, after water had risen in the lake several feet, a spring of water appeared near the center of the dam and on the east side of the river. No investigation was made as to its source, but same was incased in rock and cement and piped out at the lower edge of the dam, and this flowed continuously as long as the dam was there, and when the dam went out, 13 August, 1916, the "mineral spring" went also, showing that water was coming from the lake and finding its way through the dam from the days of its construction to its end. One of the breaks which appeared when the dam went out was at this point.

Shortly after the dam was completed water began to make its appearance at the lower toe of the dam, at places other than that constituting the "mineral spring," as mentioned above, and when the dam broke the break was at those places from which the water had been flowing ever since the dam had been there. The percolating water increased in volume as long as the Toxaway Company owned the property. Slides appeared during these eight years, some of which were 30 feet in length, 8 to 10 feet in depth, cutting away a part of the crown or crest of the dam. These were filled in with earth as they would occur.

When the dam was completed, the crest of it was used as a public road for the traveling public, and at first cement gutters were placed along on each side of the public driveway to take care of the surface water, and down-drains on both sides of the dam were constructed to carry away the accumulated surface water during rains. A spillway sufficient

to take care of all surplus water during extremes in the flood conditions was constructed around a hill covered with natural forest growth, the channel being through rock in part, and there was no obstruction placed in the spillway by the Toxaway Company.

The defendant, E. H. Jennings, a stockholder, a director, and at one time vice president of the Toxaway Company, became purchaser in July, 1911, of all the holdings of the Toxaway Company, including the dam in question. Shortly after he became the owner, a "drop-in," measuring 4 to 6 feet in diameter and 6 to 8 feet in depth, occurred at a point on the lower side of the dam, near the crest, and about over the place where the "spring," which became the "mineral spring," had its origin while the dam was being constructed. An examination of this "drop-in" by witness C. R. McNeely showed that the interior of the dam, for 15 or 20 feet in depth, was in a mushy or soggy condition. R. G. Jennings, a son of the defendant, who took charge of the Toxaway property after E. H. Jennings purchased it, was notified of this "drop-in" by C. R. McNeely, then a business partner of R. G. Jennings, at Lake Toxaway, and the expense connected with the repair was paid to McNeely by the partnership. Soon after the defendant purchased the property he had rock blasted from the hill a few feet from the east end of the dam, and this rock carried along the crest of the dam and dumped off on the lake side to prevent wave-action from cutting away the crest of the dam during high winds, the location of the dam being such as to be subjected to same at times. He also had cinders dumped into the lake, along the upper toe of the dam, supposedly to try to stop percolation of water through the dam. This, according to some of the witnesses, had a tendency to check the outflow at the lower toe for a short while, but it soon began to increase again, and kept on increasing as long as the dam stood, which was for five years after defendant bought it.

After defendant purchased the property, in order to get water from the lake with which to generate electricity to light Toxaway Inn and the premises around the lake, he built across the spillway a wall of rock about 26 inches high at the lowest place. This wall, according to some of the witnesses, raised the water in the lake when the power house was in operation (and this was about all the while during the tourist season each year), about 24 inches above the original water line. The margin between the water level in the lake and the crest of the dam was about 8 feet, the crest in the spillway being about 8 feet below the crest of the dam. In making the repairs with the rock above mentioned, the cement gutters and down-drains, to take care of surface water which fell on the dam during rains, were destroyed by workmen of the defendant, and by the traveling public, and were never replaced.

The defendant resides in Pittsburgh, Pennsylvania, and testified that he was at the dam, after purchasing it, not more than two or three times before it broke in August, 1916.

In 1908 the county of Pickens and the county of Oconee, in South Carolina, built a steel bridge across the Keowee River, twenty to twenty-five miles below Toxaway dam, which divides the two counties, each county paying one-half the expense, and the same was built for and used by the public, and paid for out of the public funds of each of the counties. This bridge was in good condition, well constructed, and of sufficient height above water to be safe from all expected floods, being about 25 feet above normal flow of river, and about 9 feet above any previous high water on said river. To replace it within a reasonable time after its destruction by the breaking of Toxaway dam, on 13 August, 1916, would have cost between $6,000 and $7,000.

· Plaintiffs also relied on certain evidence as to the poor condition of the dam from the time the defendant took charge of it until it gave way, and contended that there was no appreciable rain at the lake for about four weeks after the great rainstorm of July, 1916, allowing the water· full time to flow by the lake into the river below, where it did no harm.

## DEFENDANT'S CONTENTION

This is an action for damages alleged to have resulted from the breaking of the dam at Lake Toxaway, in Transylvania County, on 13 August, 1916. Lake Toxaway, an artificial lake formed by damming the waters of Toxaway River, was built in 1902 and 1903 by a corporation known as the Toxaway Company, in connection with the development by said company of a large boundary of land as a pleasure resort, the waters of the lake having been used primarily for the pleasure of the guests and tenants of the company in boating and fishing, and in addition thereto, by the defendant after his purchase of the property, for power purposes.

In 1911 the Toxaway Company defaulted in the payment of certain of its bonded indebtedness, and the property was foreclosed in a foreclosure proceeding in the United States District Court for the Western District of North Carolina; the defendant having become the purchaser of the property at the foreclosure sale, and being owner of the lake and dam at the time of its destruction, on 13 August, 1916.

The plaintiffs are two counties of South Carolina, and at the time of the break were the joint owners of a bridge built across Keowee River in South Carolina, and into which the waters of Toxaway River emptied. The high water resulting from the break of the Toxaway dam practically destroyed the bridge.

The plaintiffs allege:

1. Negligence on the part of the Toxaway Company in the construction of the dam, as well as negligence on the part of the said company by reason of its failure to properly maintain and keep in repair the dam during the period of the company's ownership, and seek to fix this defendant with liability for the alleged negligence of the Toxaway Company in that respect.

2. Negligence on the part of the defendant Jennings in that he failed to properly maintain and keep in repair the dam during the period of his ownership.

The allegations of the plaintiffs, both as to negligence on the part of the Toxaway Company and on the part of the defendant, are denied in the answer, and by way of further defense the defendant pleads an act of God, to wit, the unusual, unprecedented, and unforeseen conditions created in western North Carolina, in the vicinity of Lake Toxaway, by the unprecedented, unusual, and unforeseen rainfall in said area from 16 July until the breaking of the dam on 13 August, 1916. This condition of the earth being described by the engineers, who testified in the case, as super-saturation, causing an unprecedented increase in the hydrostatic pressure in the area at and around Lake Toxaway, to an extent that no human agency could have been expected to foresee or be required to provide against any such conditions, even had an adequate provision been possible.

Over a period of thirteen years the dam withstood all weather conditions without indication or evidence of weakness or defect, and finally, under conditions, the like of which no living man now remembers, failed to perform its proper functions.

The court, at the request of the plaintiff, and among other instructions, gave the following to the jury:

"No. 15. The court charges you that if you shall find that there was heavy rainfall in the locality where this lake and dam in question were located, such as could not have been reasonably anticipated or expected, and shall further find that the defendant himself did not use all available means that a reasonably prudent man would have used to make the dam safe, and shall further find that by reason of his lack of prudence, care, skill, and pains, coupled with heavy rainfalls, such as could not have been expected or anticipated, the dam broke, then the court charges you that this defendant would be liable for such damage as the plaintiffs have shown, provided the damage alleged was the proximate result of defendant's negligence. The general rule of law in regard to this question is that if damage is caused by the concurring force of the defendant's negligence, and some other cause for which he is not responsible,

including the 'act of God,' the defendant is nevertheless responsible if his negligence is one of the proximate, concurring causes of the damage. And where loss is caused by the 'act of God,' if the negligence of the defendant mingles with it, as an active, coöperative, and concurring cause, he is still responsible. An unprecedented rainfall and resulting flood, to excuse liability as an 'act of God,' must not only be the proximate cause of the injury, but it must be the sole cause. If the injury caused by the act of God would not have occurred except for the negligence of the defendant coöperating therewith, as an efficient and contributing concurrent cause, the defendant will be liable in damages."

The court, also, at the defendant's request, gave the following instruction:

"No. 11. The fact, if you so find, that the defendant was negligent, standing alone, is not sufficient to justify a recovery by the plaintiffs; such negligence must have been the proximate and efficient cause of the injury; and if you find from the evidence that there was at the dam, and in its vicinity, for a period prior to the break, an excessive, extraordinary rainfall, a rainfall which an ordinary prudent man, under the same circumstances and conditions, and in the same relation to the dam, would not have expected, and further find that had it not been for such rainfall the negligence of the defendant would have produced no damage to the plaintiffs, then the defendant would not be liable."

Exception was duly taken by the respective parties to each of these instructions.

The court submitted two issues, as to negligence and damages. The jury rendered a verdict for the defendant, answering the issue of negligence "No." Judgment thereon, and appeal by the plaintiffs.

*Welch Galloway, E. L. Herndon, James S. Carey, Jr., and McKinley Pritchard for plaintiffs.*

*W. E. Breese, D. L. English, Charles B. Deaver, and Merrimon, Adams & Johnston for defendant.*

WALKER, J., after stating the case: It was properly conceded that if the defendant, by his negligence, contributed substantially and proximately to the destruction of the dam at Toxaway Lake, he would be liable in damages to the plaintiffs, but the defendant contends that he did not do so, and that the damage to plaintiffs was caused by the unprecedented flood of that season, which could not be foreseen or restricted by him, and to which the dam succumbed, without any fault on his part.

There are many exceptions in this case, but it will not be necessary for us to consider more than two or three of them, as the others may not be presented hereafter.

It is our opinion that there was error in giving the instruction requested by the defendant, and indicated above as No. 11, and especially when, at the plaintiff's request, the court gave another instruction, No. 15, which is apparently in conflict with it, thereby leaving the jury in doubt as to the law applicable to the case. The seeming likeness of the two may have misled the court into the error, but when they are carefully examined and compared it will be found that there is an essential difference, which cannot be reconciled. Taking up first the defendant's prayer, the question was not whether the negligence of the defendant alone, or of itself, and without the aid of the rainstorm, was insufficient to have caused the break in the dam and the resultant damage to the plaintiff, but whether it contributed, as a factor, in producing the damage. The principle, as applicable to this case, is thus stated in Shearman & Redfield on Negligence, vol. 1 (Street's Ed.), p. 76, sec. 39: "It is universally agreed that if the damage is caused by the concurring force of the defendant's negligence and some other cause for which he is not responsible, including the 'act of God' or superior human force directly intervening, the defendant is nevertheless responsible, if his negligence is one of the proximate causes of the damage, within the definition already given. It is also agreed that if the negligence of the defendant concurs with the other cause of the injury, in point of time and place, or otherwise so directly contributes to the plaintiff's damage that it is reasonably certain that the other cause alone would not have sufficed to produce it, the defendant is liable, notwithstanding he may not have anticipated or been bound to anticipate the interference of the superior force which, concurring with his own negligence, produced the damage." We adopted and applied this well settled rule in *Stone v. Texas Co., Fox v. Same,* and *Newton v. Same,* all reported in 180 N. C., at pp. 543-568 (explosion cases), citing *Rwy. Co. v. Cummings,* 106 U. S., 700 (27 L. Ed., 266); *Ridge v. R. R.,* 167 N. C., 510. Several illustrations of this doctrine are given in *Stone's case,* 180 N. C., at pp. 564-5, where we further held that where there are two causes co-operating to produce an injury, one of which is attributable to defendant's negligence, the latter becomes liable, if together they are the proximate cause of the same, or if defendant's negligence is such proximate cause, citing *Ridge v. R. R., supra,* and *Steele v. Grant,* 166 N. C., 635. *Chief Justice Waite* said in the *Cummings case, supra,* that if the negligence of the defendant contributed to the injury, it must necessarily be an immediate cause of the accident, and it is no defense that another was likewise guilty of wrong. It appeared in *Dickinson v. Boyle,* 17 Pick. (Mass.), 78, that the defendant had wrongfully placed a dam across a stream on plaintiff's land, and allowed it to remain there; being swept away by a freshet in the stream, the rush of water damaged plain-

tiff's property, and it was held that defendant was liable. The wrong there, it is true, consisted in the placing the dam on the plaintiff's land, while the wrong alleged here is in negligently building and maintaining a dam on defendant's own land, but the difference in the particular nature of the wrong does not, in law, distinguish the two cases, but they will not, of course, be alike unless the jury find from the evidence that defendant was guilty of negligence, as that is the basic fact upon which the plaintiff's case must rest. If there was no negligence, it follows that there was no wrong, or if there was negligence, but it had nothing to do with the destruction of the dam, which, on the contrary, was caused by an unprecedented rainstorm, or by some other cause for which the defendant was in no degree responsible, he would not be liable. He is fixed with liability when, by his own negligence or in conjunction with that of another, he has brought himself within the condemnation of a favorite maxim of the law, which enjoins that a man should so use his own property as not to injure that of another. Blackstone, 306.

Counsel discussed before us at some length the difference between ordinary care, the highest degree of care and gross negligence, but we deem it unnecessary to draw any distinction between them. It is all but ordinary care, which means that degree of care which a man of ordinary prudence would use in the same or similar circumstances. It must be that more care is required as the danger increases, and the degree of care in the particular case must be proportioned to the danger. We cannot do better than refer to the case of *Milwaukee R. Co. v. Arms,* 91 U. S., 489 (23 L. Ed., 374), where *Justice Davis* discusses this question: "If the law furnishes no definition of the terms 'gross negligence' or 'ordinary negligence' which can be applied in practice, but leaves it to the jury to determine in each case what the duty was, and what omissions amount to a breach of it, it would seem that imperfect and confessedly unsuccessful attempts to define that duty had better be abandoned. Some of the highest English courts have come to the conclusion that there is no intelligible distinction between ordinary and gross negligence. Redf. Car., p. 376. *Lord Cranworth,* in *Wilson v. Brett,* 11 M. & W., 113, said that gross negligence is ordinary negligence with a vituperative epithet; and the Exchequer Chamber took the same view of the subject. *Beal v. R. Co.,* 3 H. & C., 337; *Grill v. Gen. Iron Screw Collier Co.,* 3 R., 1 C. P., 1865-66, p. 600, were heard in the Common Pleas on appeal. One of the points raised was the supposed misdirection of the *Chief Justice* who tried the case, because he had made no distinction between gross and ordinary negligence. *Justice Willes,* in deciding the point, after stating his agreement with the dictum of *Lord Cranworth,* said: 'Confusion has arisen from regarding negligence as a positive instead of a negative word.' It is really the absence of

such care as it was the duty of the defendant to use. Gross is a word of description, and not of definition; and it would have been only introducing a source of confusion to use the expression 'gross negligence' instead of the equivalent—a want of due care and skill in navigating the vessel—which was again and again used by the *Lord Chief Justice* in his summing up. 'Gross negligence' is a relative term. It is doubtless to be understood as meaning a greater want of care than is implied by the term 'ordinary negligence'; but, after all, it means the absence of the care that was necessary under the circumstances."

No better standard has yet been devised than the care of the "ordinarily prudent man."

There were numerous questions argued before us, more or less involved in the controversy. They may not arise again, or, if they do, not in the same way, nor with respect to the same facts, and we, therefore, pretermit a discussion of them and will rest content with those we have considered, with one exception.

There is a question of evidence in the case. The court allowed the plaintiff to introduce certain reports as to the state of the weather at other places than Toxaway. These were not relevant to the issues which related only to the rainfalls at Toxaway Lake or in its vicinity or within its watershed, as tending to show how that stream was affected thereby. It could make no difference how many, or how few, rains fell at other places if they had no effect on Toxaway River or Lake, nor do we see how the engineer in constructing the dam could rely with any degree of certainty on how much or how often rain would fall at Toxaway by estimates based upon rains in other sections of the State. This, we think, should be excluded, unless its relevancy hereafter more clearly appears.

For the reasons stated another trial must be ordered.

New trial.