LeGRAND K. JOHNSON AND LESBIA G. JOHNSON v. CITY OF WINSTON-SALEM AND S. C. HARPER.

(Filed 24 March, 1954.)

**1. Waters and Watercourses § 4—**

Where there is an open drainway following a natural depression draining the surface waters, each upper proprietor has an easement in the lower estates for the surface waters to flow in their natural course or manner without obstruction or interruption, and each lower proprietor is required to receive and allow the passage of the natural flow of the surface waters from the higher land.

**2. Same—**

Where upper proprietors have constructed a conduit to take care of the natural drainage of the waters along a depression, the lower proprietor

at the mouth of the conduit may allow the surface waters to continue to flow across his land in the natural depression, but if for his own convenience and the better enjoyment of his property he continues the underground conduit across his land, the law imposes upon his ownership the burden of exercising ordinary care to keep the artificial drain open and in repair so as to accommodate the natural flow of surface waters from the upper tenements without injury to the lower tenements along the line of the drainway.

**3. Same: Easements § 6—**

Where the purchaser takes land with notice of a private underground conduit taking care of the natural flow of surface waters, he takes *cum onore*, and is under the duty to exercise ordinary care to keep the artificial underground drainage open and in repair.

**4. Trial § 24a—**

Plaintiff may be nonsuited on the ground of an affirmative defense only when plaintiff's own evidence establishes the truth of the affirmative defense as a matter of law.

**5. Municipal Corporations § 15d—**

A municipality may be held liable for damages to lands resulting from obstructions of drains and culverts constructed by third persons only when the city adopts the drains and culverts as a part of its drainage system or assumes control and management thereof.

**6. Same: Waters and Watercourses § 4—**

In this action against a landowner for negligent failure to maintain a conduit under his land to take care of the natural drainage of surface waters, plaintiff's evidence disclosed that the city widened the street and constructed catch basins along land draining into the conduit, but did not show that the city increased the volume of surface waters beyond the capacity of the private conduit as constructed or exercise any control or supervision over it. *Held:* The evidence does not justify nonsuit on the ground that plaintiff's evidence showed that the city and not defendant was under legal duty to maintain the conduit.

**7. Same—**

The fact that a municipality, after the basement in the house occupied by plaintiff had been flooded from overflow of a private culvert which had become obstructed, sent its employee to the premises and assisted in cleaning out the basement, and thereafter constructed another drain to take care of a part of the flow of surface waters, defendant furnishing the pipe, shows at most a joint undertaking by the city and defendant insufficient to exonerate the defendant from liability for failure to maintain his private conduit.

**8. Waters and Watercourses § 4—Evidence of defendant's failure to exercise due care to keep private drain in repair held for jury.**

Plaintiff's evidence tended to show that a hole started developing over an underground drain which had been constructed by defendant's predecessor in title to take care of the natural drainage of surface waters, that defendant had bought with knowledge of the artificial drain, that the hole

which developed was triangular in shape and from 20 to 25 feet deep, that a fence was erected around it, and that some several weeks later, during a hard rain, the waters washed a large piece of terra cotta pipe so that it stuck across the outlet on the other side of a manhole near the house in which plaintiff resided, causing the waters to overflow and flood the basement of the house and damage the plaintiff's personal property stored in the basement. *Held:* Plaintiff's evidence makes out a *prima facie* case of actionable negligence on the part of defendant in failing to exercise proper care to keep the drain open and in repair.

APPEAL by plaintiffs from *Crisp, Special Judge,* at 13 April Term, 1953, of FORSYTH.

Civil action by plaintiffs, lower proprietors, to recover for flood damage to personal property located in the basement of their home, due to the alleged negligence of the defendant Harper, upper proprietor, in failing to keep in proper repair a large subsurface drain pipe running under his property.

The drain was installed many years ago—exactly when not appearing, but sometime prior to 1920—in a natural drainage depression just off 4th Street in the City of Winston-Salem. The depression through which the pipe was laid was filled in and thereafter most of the land along its course was developed as residential property. The drain begins on the north side of 4th Street about the center of the block at Grace Court and runs thence in a northwesterly direction, about parallel with Brookstown Avenue, through the approximate center of three city blocks, passing under 5th Street, Jersey Avenue, Carolina Avenue, and there emptying into the open channel of the original drainway, from whence the waters ultimately flowed on beyond Hanes Park into Peters Creek.

The accompanying map, made from a photograph of the blackboard sketch used by the plaintiffs in the trial below to illustrate the testimony of the witnesses, shows the location of the drain. It is indicated by the dotted line running from 4th Street through Grace Court to Carolina Avenue. The plaintiffs resided in the house on Carolina Avenue indicated on the map by the rectangular figure near the intersection of Carolina and Brookstown Avenues. The rest of the property along the drain in that block, east of the plaintiffs' home, was owned by the defendant Harper.

The area of 4th Street which drained into this underground pipe line was about 540 feet in length on the south side and from 615 to 620 feet on the north side. The street is about 65 feet wide east of Grace Court and 100 feet wide where it converges into Glade Street on the southwest. The waters from this area flowed into the catch basins on 4th Street, one on the north side and the other on the south side of the street. These catch basins emptied into 18-inch drains and then into a single 18-inch

JOHNSON *v.* WINSTON-SALEM.

drain which ran across Grace Court to another catch basin at the north end of the park. From that point on 5th Street the drain was a 24-inch pipe all the rest of the way to Carolina Avenue.

Grace Court is a small public park covered with grass and trees. In 1928 the City of Winston-Salem widened 4th Street approximately 12 feet, taking from the park and paving as a part of the street a strip approximately 12 x 500 feet, from which the water flowed directly into the catch basins on the street. The evidence discloses no drainage into this underground drain above the Harper property except the surface waters from Grace Court and the upper and lower reaches of 4th Street— though Harper admits in his answer that the down spouts from the buildings on his property emptied into the drain. There were no catch basins on 5th Street or on Jersey Avenue. There were catch basins on Carolina Avenue which emptied into the drainway.

Sometime prior to 1920, C. M. Thomas acquired the eastern part of the block between Jersey and Carolina Avenues and extended the artificial drain all the way across his property (300 feet), using pipe 24 inches in diameter, the same size used by the upper landowners in bringing the artificial drain down to the Thomas property line at Jersey Avenue. Thomas, after extending the pipe line across his property, then filled in the open depression through which the water from above had previously flowed and developed the property for residential purposes. He built a large residence at the upper end of his lot, partly over the underground drain. The house is shown on the map by the square figure near the intersection of Jersey and Brookstown Avenues.

Some years later the defendant Harper acquired all the Thomas property and converted the old Thomas residence into an apartment house. The defendant Harper later conveyed about 50 feet of the property at the lower end next to Carolina Avenue to his son, Roger Harper, the plaintiffs' landlord. There was a manhole on the Roger Harper property just above the western end of the house where the plaintiffs live. This manhole, approximately 10 feet from the plaintiffs' house, is indicated on the map with a figure "X." The manhole was about 20 feet deep and about 2 feet across. The pipe entered at the bottom of the manhole from the southeast side. The outlet pipe was on the opposite side of the manhole. The distance from the catch basins on 4th Street to the manhole was approximately 600 feet. The fall from 4th Street to the manhole was from 40 to 50 feet.

Some weeks prior to 27 June, 1949, a hole started developing over the underground drain on the downhill side of the old C. M. Thomas house. This hole is indicated on the map by an "X" inside a circle. The hole was triangular in shape, with 20-foot sides, and was from 20 to 25 feet deep. The plaintiff L. K. Johnson testified in part: ". . . there was a

hole that started developing several weeks prior to the flood; the ground started eroding away and going down into the old drain pipe . . . I went up there and looked at it, . . . they erected a sort of fence around this hole. . . . some posts stuck up there, with a string running across it, as a warning that the hole was there. For this period of a few weeks apparently this cedar tree had washed a little bit down into it and was falling down into it; . . . I thought that hole was 20 to 25 feet from top to bottom. . . . I saw Mr. Harper (the defendant) looking at the hole . . . the sunken place, with some men, before the flood and after."

On the evening of 27 June, 1949, there was a very heavy rain for about four hours. One witness testified: ". . . at that time, we felt like we'd almost had a cloudburst." Another witness said: "The rain that night looked like to me it was a flood. We have rains like that around here right smart, sometimes; it happens maybe three or four times a year; . . ." Other witnesses testified that the rain was very heavy, but they had seen it rain as heavy or heavier.

During the rain the manhole just below the property occupied by the plaintiffs overflowed by reason of the fact that it became stopped up by a large piece of terra cotta pipe which washed down the pipe into the manhole and lodged against the outfall side of the manhole. This caused the water to gush out of the manhole in great volume and force. It forced the lid off the manhole and rose several feet into the air like a geyser, and so continued for an hour or more. Pieces of the terra cotta drain pipe and various kinds of foreign substances and debris washed out of the manhole. Water in great force and volume flooded the space between the manhole and the house and poured into the basement through two ground-level windows on the south side of the house. The basement filled completely up with water in less than an hour—"from top to bottom . . . to a depth of 65 inches," doing considerable damage to plaintiffs' personal property stored in the basement. Next day fronds from a cedar tree were found pasted on the walls of the basement.

Witness Thompson, who assisted in cleaning out the manhole next morning, testified: "We worked a long time before we finally got to the bottom. We finally got some tools we call books and spearheads, and . . . pulled a piece of pipe away from over the mouth of . . . the outlet of the manhole. . . . What caused the stoppage of the flow through there was a piece of terra cotta line . . . sitting up over the mouth of the outlet of the pipe, . . . it came down from above the line somewhere."

The witness Ellis testified that next day he crawled up the pipe line 120 feet from the manhole toward the apartment house on the defendant Harper's land and there found where a piece of pipe was broken out. As the witness put it: ". . . I found where that piece had left from there and come down and stopped it up, and all the pipe was 'squashed' down

. . . I couldn't go any farther than 120 feet because the pipe was . . . blocked and closed entirely; the pipe was broke all to pieces; the hole where the pipe had been, . . . had dropped down, like it done give out. . . . I crawled to the place on the Harper property and located the place up there . . . where that piece of pipe (identified as resembling the large piece taken out of the manhole) fitted in the break."

The City of Winston-Salem sent its employees to drain and assist in cleaning out the basement after the flood. Later a catch basin was put in the drain on the upper side of Jersey Avenue and the entire line of drainage from that point was diverted to another drain under Brookstown Avenue. The City did this work and the defendant Harper paid for the pipe.

The plaintiffs instituted this action against both the City of Winston-Salem and S. C. Harper, alleging that the damage complained of was proximately caused by the concurrent negligence of the City and the individual defendant, the negligence alleged being in gist that the City wrongfully diverted surface waters into this drain, and that each defendant, being under legal duty to maintain the drain, failed to exercise due care in keeping it in proper repair.

The defendants filed separate answers, denying all allegations of negligence. The defendant Harper by way of further defense alleges in substance that the drain was under the control of the City of Winston-Salem and that no legal duty rested on him to maintain or repair it. The defendant Harper also pleaded over against the City in the alternative, alleging in substance that he is entitled to (1) exoneration under application of the doctrine of primary and secondary liability, or (2) contribution under the joint tort-feasor statute, G.S. 1-240.

At the opening of the trial the plaintiffs submitted to a voluntary nonsuit as to the City of Winston-Salem. Thereupon the defendant Harper submitted to like nonsuits in respect to his cross-actions against the City.

At the close of the plaintiffs' evidence, the motion of the defendant Harper for judgment as of nonsuit was sustained, and from judgment entered in accordance with such ruling the plaintiffs appeal.

*Deal, Hutchins & Minor* for plaintiffs, appellants.
*Ratcliff, Vaughn, Hudson, Ferrell & Carter* for defendant *S. C. Harper*, appellee.

JOHNSON, J. The gravamen of the plaintiffs' cause of action is that the defendant Harper, being under legal duty to maintain the drain pipe under his land, negligently permitted it to remain in a known state of disrepair, thereby proximately causing the injury and damage in suit.

The individual defendant takes the position it was the sole duty of the City of Winston-Salem to maintain the drain, and that if this be so, he may not be held actionably negligent for failure to make the repairs.

Therefore, at the threshold of the appeal we are confronted with the question whether the evidence below is sufficient to show *prima facie* that the defendant Harper was under legal duty to maintain the section of the drain pipe under his property. This seems to be the pivotal question on which decision turns.

The circumstances and events by which the underground drain across the defendant Harper's land came to be substituted for the original open drain are relevant to the inquiry at hand.

The original open drain on the defendant Harper's land was part of an open drainway which followed a natural drainage depression leading downgrade from 4th Street to and beyond what is now Hanes Park. In this situation the ownership of each of the various parcels or tracts of land along the course of the drainway was subject to these reciprocal rights and duties with respect to drainage: The law conferred on the owner of each upper estate an easement or servitude in the lower estates for the drainage of surface water flowing in its natural course and manner, without obstruction or interruption by the owners of the lower estates to the detriment or injury of the upper estates. Each of the lower parcels along the drainway was servient to those on higher levels in the sense that each was required to receive and allow passage of the natural flow of surface water from the higher land. *Phillips v. Chesson,* 231 N.C. 566, 58 S.E. 2d 343; *Davis v. Atlantic Coast Line R. Co.,* 227 N.C. 561, 42 S.E. 2d 905; *Darr v. Aluminum Co.,* 215 N.C. 768, 3 S.E. 2d 434; *Winchester v. Byers,* 196 N.C. 383, 145 S.E. 774; *Porter v. Durham,* 74 N.C. 767; *Overton v. Sawyer,* 46 N.C. 308. See also 56 Am. Jur., Waters, Sec. 68 *et seq.*

The then owner of the Harper property, located as it was in an intermediate position along the course of this drainway, was both a dominant and a servient proprietor. As servient to the upper proprietors, he was not permitted by law to interrupt or prevent the natural passage of waters, to their detriment. And conversely, as the owner of an estate dominant to the lower tenements, he was required, under pain of incurring actionable liability, to refrain from interfering with the natural flow of waters by artificial obstruction or device, to the detriment or injury of the lower tenements. *Phillips v. Chesson, supra; Commissioners v. Jennings,* 181 N.C. 393, 107 S.E. 312; Farnham, Waters and Water Rights, Sec. 889d.

Prior to 1920, with the ownership of the property along this natural drainway being subject to the foregoing reciprocal rights and duties as to drainage, the upper segments of the present underground line of drain-

age were installed, beginning at 4th Street and running through the first and second blocks down to the edge of the Harper property at Jersey Avenue. Sometime thereafter, C. M. Thomas, the then owner of all the property along the drainway between Jersey and Carolina Avenues, extended the artificial drain on through his property the entire length of the block, using pipe the same size and capacity as that used by the adjoining landowners in the block above, and then filled in the natural drainage depression and channel through which the conduit was laid and developed his lands as residential property.

Thomas was not required to extend the underground conduit that had been brought down to Jersey Avenue by the upper owners. On the record as presented his act in so doing was entirely voluntary and unaided by any other person or by the City of Winston-Salem. He could have left this drainway open across his land, so as to let the natural flow of waters from the upper tenements empty from the end of the conduit at Jersey Avenue into the established open channel and continue to flow thence across his land to Carolina Avenue, and from there on, as at present, in an open channel across the block immediately below Carolina Avenue and on to West End Boulevard. In such manner Thomas, as owner of a lower parcel of land, servient for natural drainage purposes to higher lots along this hillside drainway, may well have fulfilled his duties to the upper proprietors.

However, when Thomas, presumably for his own convenience and for the better enjoyment of his property, closed the natural depression and channel through which the waters from the upper, dominant tenements had been accustomed to flow and installed in lieu thereof the underground conduit, the law imposed upon his ownership the burden of maintaining the artificial drain, requiring him to take care, not as an insurer but in the exercise of ordinary care, to keep the conduit through his land open and in repair so as to accommodate the natural flow of surface waters from the upper tenements across his land without injury to the lower tenements along the line of the drainway. The true rule as to this would seem to be that ordinarily a lower or intermediate proprietor along a natural drainway who for his own convenience and the better enjoyment of his property closes the natural channel of open drainage and installs in lieu thereof an underground conduit into which the natural flow of upper waters is channeled to the next tenement below, is required to maintain the artificial drain so installed, and in doing so he must exercise ordinary care, under pain of subjecting himself to actionable tort liability, to see that no injury by breakage, leakage, seepage, or overflow is done by it to lower tenements. *Commissioners v. Jennings, supra; Phillips v. Chesson, supra;* Farnham, Waters and Water Rights, Sections 448, 830, 889d, and

926; *Armstrong v. Luco,* 102 Cal. 272, 36 P. 674; 67 C.J. 887; 56 Am. Jur., Waters, Sec. 68, pp. 551, 552.

We see no reason why the general rule which fixes the mutual and reciprocal rights and liabilities of adjoining landowners under the maxim *sic utere tuo ut alienum non laedas,* requiring that each use and maintain his own land in a reasonable manner as not to injure the property or invade the legal rights of his neighbor, should not apply with all its rigor to a property owner who for the better enjoyment of his property closes an open drainway fixed by nature across his land and installs in lieu thereof an underground conduit. 1 Am. Jur., Adjoining Landowners, Sections 3 and 13; 2 C.J.S., Adjoining Landowners, Sections 1, 41 and 44.

The evidence here is plenary that when the defendant Harper purchased the lands from Thomas, he did so with notice of the artificial condition previously created by Thomas. This being so, the property passed to the defendant Harper *cum onere,* and specifically subject to all existing servitudes with respect to maintenance of the underground drainage system. See 17 Am. Jur., Easements, Sections 128 and 130.

Similarly, when the defendant Harper conveyed the lower 50-foot lot to the plaintiffs' landlord, Harper's original duty of upkeep and maintenance continued as to the conduit under the portion of the tract retained by him. See Farnham, Water and Water Rights, Sections 831 and 908.

It necessarily follows that the plaintiffs' evidence is sufficient to show *prima facie* that the defendant Harper was under legal duty to maintain the conduit under his land.

This brings us to a consideration of the defendant Harper's further defense that the City and not he was under the legal duty to maintain the conduit under his land. The gist of the further defense and contentions made thereunder is that although this underground drain originally may have been a private drainage project, it had lost its identity as such and had been taken over or appropriated as a part of the city street and park drainage system, and while the burden of maintenance and upkeep may have rested originally upon the property owners along the drain, this burden had passed to the City by operation of law as incident to its use and control of the pipe line. The plea so made by Harper necessarily stands as an affirmative defense only against the plaintiffs, since the City of Winston-Salem was released from the case by voluntary nonsuits taken before the commencement of the trial, by the plaintiffs as to their action against the City, and also by Harper in respect to his cross-actions against the City.

Even so, Harper's affirmative defense is entitled to consideration under application of the rule of procedural law which provides that "When the plaintiff offers evidence sufficient to constitute a *prima facie* case in an action in which the defendant has set up an affirmative defense, and the

evidence of the plaintiff establishes the truth of the affirmative defense as a matter of law, a judgment of nonsuit may be entered." *Hedgecock v. Ins. Co.,* 212 N.C. 638, 641, 194 S.E. 86. Nevertheless, the merits of the affirmative defense are to be determined by principles of substantive law. And as to this, the general rule is that a municipality becomes responsible for maintenance, and liable for injuries resulting from a want of due care in respect to upkeep, of drains and culverts constructed by third persons when, and only when, they are adopted as a part of its drainage system, or the municipality assumes control and management thereof. *City of Irvine v. Smith,* 304 Ky. 868, 202 S.W. 2d 733; 63 C.J.S., Municipal Corporations, Sec. 877; 38 Am. Jur., Municipal Corporations, Sec. 636. Accordingly, there is no municipal responsibility for maintenance and upkeep of drains and culverts constructed by third persons for their own convenience and the better enjoyment of their property unless such facilities be accepted or controlled in some legal manner by the municipality. *Robinson v. Danville,* 101 Va. 213, 43 S.E. 337; *Lander v. Bath,* 85 Me. 141, 26 Atl. 1091; McQuillin, Municipal Corporations, Third Edition, Sec. 53.118.

The defendant Harper in support of his affirmative defense points to the evidence that the City in 1928 made extensive street improvements along 4th Street in the vicinity of Grace Court, and thereby materially increased the flow of street surface waters into the catch basins around Grace Court, and diverted into this underground drain vast quantities of surface waters which naturally would have flowed elsewhere than along the original channel where the underground drain was installed. Upon the record as presented, this evidence is without material significance as tending to show legal appropriation or control of the entire conduit by the City. This is so for the reason it affirmatively appears that when Harper's predecessor in title voluntarily extended the line through his property, he used pipe 24 inches in diameter, the same size as that used by the upper landowners in the block above him. This, nothing else appearing, indicates assent by the owners of the lands along the conduit to its use up to capacity. There is no evidence that the City augmented the flow of water to the point of overloading the drain or causing an overflow, and the plaintiffs' claim here asserted is not, on this record, traceable to any such causal origin. Therefore the appeal as presented does not bring into focus the rules of law applicable where there is an acceleration or increase in the volume of surface waters in or through a drain incident to the improvement of lands. Accordingly, we deem it unnecessary to discuss the refinements of these rules of law. See *Davis v. Atlantic Coast Line R. Co., supra* (227 N.C. 561); 56 Am. Jur., Waters, Sections 71, 72, and 73. Moreover, the fact that a private line of drainage is connected with a municipal culvert under circumstances involving

no dedication by the private owner or control by the municipality, ordinarily does not make the latter liable for damages to private property caused by a break in the private line. See *Lynch v. Clarke,* 25 R.I. 495, 56 Atl. 779; *City of Irvine v. Smith, supra; Kansas City v. Brady,* 52 Kan. 297, 34 P. 884, 39 Am. S. R. 349.

The defendant Harper also points to the evidence tending to show that the City sent its employees to the plaintiffs' premises and assisted in cleaning out the basement after it was flooded, and that sometime later the City installed a catch basin on the upper side of Jersey Avenue and diverted this entire line of drainage into another drain under Brookstown Avenue. This line of evidence is without probative force of substance. The events related took place after the flood, and while city employees made the new installation, the record discloses that the defendant Harper furnished the pipe. So, at most, this was a joint undertaking by the City and Harper.

In determining whether the evidence establishes Harper's affirmative defense, we are not concerned with the plaintiffs' abandoned allegations against the City. Decision here must be rested wholly and solely upon an evaluation of the plaintiffs' evidence as it comes to us at the *prima facie* level. Our examination of it leaves the impression that the plaintiffs did not prove themselves out of court by fixing upon the City the duty of maintaining this conduit and keeping it in repair. The record discloses no evidence tending to show dedication or legal acceptance by the City of the drain as a part of its drainage system, nor control over it by the City as such, within the purview of the controlling principles of law. Instead, the plaintiffs have established *prima facie* that the duty and responsibility of keeping up the drain rested upon the defendant Harper.

So, then, we come to consider the final question whether the plaintiffs made out a *prima facie* case of actionable negligence against the defendant Harper for failure to keep in repair the drain under his land.

The evidence adduced below, when tested by the principles which control the law of actionable negligence (*Hall v. Coble Dairies,* 234 N.C. 206, 67 S.E. 2d 63; 38 Am. Jur., Negligence, Sections 57, 58, and 62), leaves the impression that it is sufficient to justify, though not necessarily to impel, the inference of negligence on the part of the defendant Harper as the proximate cause of the plaintiffs' injury and damage. Thus a jury trial is necessary. This being so, we deem it appropriate to refrain from further comment or elaboration on the various aspects of the evidence.

The judgment of nonsuit entered below is
Reversed.

BOBBITT, J., took no part in the consideration or decision of this case.