J. W. PENDERGRAST AND WIFE, CATHERINE W. PENDERGRAST v. R. C. AIKEN AND WIFE, M. E. AIKEN, W. L. AIKEN, AND PERRY ALEXANDER CONSTRUCTION COMPANY

No. 48

(Filed 23 August 1977)

**1. Waters and Watercourses § 1— drainage problems—surface waters defined**

For purposes of analyzing drainage problems, the N.C. Supreme Court has combined diffuse surface waters, watercourses and overflow waters from the ocean into the broader category of surface waters.

**2. Waters and Watercourses § 1— surface water drainage—common enemy rule defined**

The common enemy rule is that a landowner is privileged to use and improve his land for proper purposes even though the natural flow of surface water is

Pendergrast v. Aiken

thereby altered so long as he uses reasonable care to avoid causing unnecessary harm to others.

**3. Waters and Watercourses § 1— surface water drainage—civil law rule defined**

The civil law rule subjects a landowner to liability whenever he interferes with the natural flow of surface waters to the detriment of another in the use and enjoyment of his land; North Carolina has long adhered to this rule.

**4. Waters and Watercourses § 1— surface water drainage—reasonable use rule defined**

The reasonable use rule allows each landowner to make reasonable use of his land even though, by doing so, he alters in some way the flow of surface water thereby harming other landowners, liability being incurred only when this harmful interference is found to be unreasonable.

**5. Waters and Watercourses § 1— surface water drainage—rule of reasonable use adopted—civil law rule abandoned**

The Supreme Court formally adopts the rule of reasonable use with respect to surface water drainage and abandons the civil law rule, since the reasonable use rule is more in line with the realities of modern life, and consistency, fairness and justice are better served through the flexibility afforded by that rule.

**6. Waters and Watercourses § 1— surface water drainage—reasonable use rule—harm to plaintiff weighed against utility of defendant's conduct**

The reasonable use rule explicitly, as in the case of intentional acts, or implicitly, as in the case of negligent acts, requires a finding that the conduct of defendant was unreasonable, reasonableness being a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant.

**7. Nuisance § 7; Waters and Watercourses § 1— surface water drainage—reasonable use rule—alteration reasonable and harmful—compensation required**

Under the rule of reasonable use with respect to surface water drainage, even should alteration of the water flow by the defendant be "reasonable" in the sense that the social utility arising from the alteration outweighs the harm to plaintiff, the gravity of the harm may be found to be so significant that it requires compensation regardless of the utility of the conduct of defendant.

**8. Nuisance § 7; Waters and Watercourses § 1— culvert in bed of stream—reasonable use rule—civil law rule—instructions contradictory**

In an action to recover damages for flooding allegedly caused by defendants' placement of a 36-inch culvert in the bed of a stream flowing from plaintiffs' land onto and through defendants' land, the trial court erred in instructing the jury on the reasonable use rule and the civil law rule with respect to surface water drainage, since the instructions were contradictory and served only to confuse and mislead the jury.

**9. Nuisance § 7; Waters and Watercourses § 1— culvert in bed of stream—nuisance and damages—separate issues—instructions improper**

In an action to recover damages for flooding allegedly caused by defendants' placement of a 36-inch culvert in the bed of a stream flowing from plaintiffs' land onto and through defendants' land, the trial court erred in instructing the jury that it must first determine whether defendants created a nuisance, and then separately decide whether plaintiffs were harmed thereby, and the court erred in stating that the jury could answer the first issue yes and the second issue no,

since the jury could not find that a nuisance existed at all without a finding of substantial damage to plaintiffs.

**10. Nuisance § 7; Waters and Watercourses § 1— culvert in bed of stream—flooding —nuisance—effect of factors downstream—instructions**

In an action to recover damages for flooding allegedly resulting when defendants placed a 36-inch culvert in the bed of a stream which crossed plaintiffs' land, then flowed onto and across defendants' land, and then was channeled through two 24-inch culverts under a street, the effect, if any, of the two 24-inch culverts had no legal significance relative to the dispute between plaintiffs and defendants, and the court erred in instructing the jury that it might consider the inadequate drainage through the 24-inch culverts from defendants' land.

PLAINTIFFS appeal from decision of the Court of Appeals, 32 N.C. App. 89, 231 S.E. 2d 183 (1977), upholding judgment of *Martin, J.,* entered at the 19 January 1976 Session, BUNCOMBE Superior Court.

Plaintiffs' evidence tends to establish the following:

Plaintiffs are the owners of a tract of land which borders U.S. Highway 25 in Buncombe County in an area of commercial development known as Skyland. On this tract plaintiffs own a brick and concrete-block building consisting of an upper floor and a basement with a dirt floor. The building measures approximately 50 by 50 feet. At the time of the incidents which precipitated this lawsuit, plaintiffs maintained a laundry and dry-cleaning business in part of the building and leased the remaining area to a hardware company and a beauty salon.

A small branch entered plaintiffs' property from the north through a corrugated iron culvert 30 inches in diameter. A second, smaller branch joined the first branch at the upper end of the property after entering through two 15-inch culverts. The resulting small creek drained a watershed of approximately 90 acres and maintained a continuous flow throughout the year, even during dry spells. The creek flowed in a southerly direction about 30 feet from the rear of the building.

The property immediately to the south, which also adjoins U.S. 25, was undeveloped at the time of this lawsuit and belonged to defendants Aiken. The southern boundary of the Aiken property was Allen Avenue. The stream flowed through this property in a natural drainage ditch or depression and exited through two 24-inch culverts under Allen Avenue.

In 1972 the State Highway Commission began a project to widen U.S. 25 in that area from two lanes to five. Charles Smith was

the general superintendent of defendant Perry M. Alexander Construction Company, the general contractor for the road work. After work began on U.S. 25, Smith contacted defendants and asked them if they would like to have their land filled with excess dirt from the highway project. At the time, the Aiken property was between four and six feet below the level of the road. The Aikens replied that they did not want dirt containing trash, which Smith was offering at no charge, but that they would pay to have "good dirt," free from debris, dumped on their land. Smith pointed out that they would need to have a pipe laid to carry the stream, which otherwise would be filled in. After some negotiation, the Aikens and Smith agreed that Smith would order 274 feet of 36-inch iron corrugated pipe, would place the pipe in the creek and would then fill up the creek and the property with "good dirt." Smith maintains that the Aikens specified 36-inch diameter pipe, while the Aikens testified that Smith recommended that size. In any event, in February 1973 the pipe was installed and the land filled.

Thereafter on 15 or 16 March 1973 there was a rainfall of substantial but apparently normal volume. For the first time since plaintiffs moved onto their property in 1962, the creek backed up and flooded the basement of plaintiffs' building to a depth of approximately 13 inches. Two other rains in April and May 1973 caused similar flooding. On 27 May 1973 Buncombe County experienced an exceptionally heavy rain which exceeded 4 inches in a 12-hour period. Some witnesses testified that was the heaviest rain they had ever seen in the area. According to plaintiffs' expert witness, a civil engineer, that amount of rain "is an extraordinary unexpected downfall of water." The creek again backed up and flooded plaintiffs' basement, this time to a depth of over five feet. Subsequent heavy rains also resulted in flooding. In all, plaintiffs' complaint alleges six separate flooding incidents.

Concerning the drainage at the two properties, plaintiffs testified that before the pipe was installed on the Aikens' land, "[o]ccasionally, the stream would back up behind Allen Avenue [on defendants' property]. There would be a big puddle of water down there, but it just dispersed over that property below me. It never did back up on my property at all." Plaintiffs enlisted the services of Walter C. Bearden, a civil engineer, to study and report on their property's drainage problems. Bearden testified that sound engineering practices required the installation of drainage facilities capable of handling a "twenty-five year flood," that is, the greatest amount of rainfall in a single twenty-four hour period that, accord-

ing to National Weather Service statistics, one might expect in a twenty-five year period. In Asheville, that figure is seven inches of rain. According to Bearden's calculations, the ninety-acre watershed which drained into the small creek would produce a flow of 800 gallons of water per minute during a "twenty-five year flood." According to his calculations, the 36-inch culvert on the Aiken property has a maximum capacity of 260 gallons per minute. Thus, in his opinion, "the culvert, the thirty-six inch culvert, was completely inadequate to carry the water."

Bearden also testified that a single 36-inch culvert carried more water than two 24-inch culverts and that "[g]enerally speaking, it is bad engineering practice to run a pipe with capacity of thirty-six inches into two twenty-four inch pipes." Thus, in Bearden's opinion, the 36-inch pipe was too large to be connected to the two 24-inch pipes and yet was too small to drain the Pendergrast property.

Sometime in the fall of 1974 the State Highway Commission installed two 60-inch culverts underneath Allen Avenue. These culverts each have a capacity of 1,120 gallons per minute. However, the installation of these large diameter culverts did not stop the flooding on plaintiffs' land.

Bearden also inspected plaintiffs' building. "I found two water marks obviously made at two different times. The highest water mark was five and four-tenths feet above the basement floor. The lowest water mark was three and two-tenths feet above the basement floor. These water marks were obviously made at different times. The floor was very wet and covered with mud. . . . I examined the basement wall. North wall was very badly cracked. There were cracks also in the two other walls." In his opinion, the building "had been badly flooded two different times." The cause of this flooding was the "completely inadequate" capacity of the Aikens' 36-inch culvert to carry the expected run-off from the watershed into the creek.

Immediately before this action came to trial, defendants Aiken sold the property to a third party who promptly dug up the buried culvert. Although the pipe was left in place, the net effect was to restore the original drainage conditions to the Pendergrast property.

Defendants offered no evidence.

Perry Alexander Construction Company's motion for a directed verdict was allowed and plaintiffs did not appeal that decision.

The following issues were submitted to the jury: (1) Did the defendants Aiken create a nuisance by installing and covering a 36-inch drain across their property? (2) If so, did defendants Aiken thereby cause damage to plaintiffs' property? (3) What amount of damages, if any, are plaintiffs entitled to recover of the defendants Aiken? The jury answered the first issue "Yes," the second issue "No" and did not answer the third issue. Judgment on the verdict was entered for defendants and plaintiffs appealed to the Court of Appeals which upheld the judgment, Judge Martin dissenting. Plaintiffs thereupon appealed to this Court as of right, assigning errors noted in the opinion.

*Gudger, McLean, Leake, Talman & Stevenson by Joel B. Stevenson for plaintiff appellants*

*Morris, Golding, Blue and Phillips by Steven Kropelnicki, Jr. and William C. Morris, Jr., for defendant appellees*

HUSKINS, Justice.

Plaintiffs assign as error the failure of the trial judge to instruct the jury correctly on the law arising from the evidence. By this assignment plaintiffs present three questions for consideration: (1) Did the court err in its original charge by framing its instructions in terms of nuisance? (2) Did the court err in its instruction to the jury that it must first determine whether defendant created a nuisance and then decide whether plaintiffs were harmed thereby? (3) Did the court err in its supplemental instructions regarding the effect of the two 24-inch culverts installed by the City under Allen Avenue? We shall consider these questions seriatim. Since their resolution lies in determination of applicable law, we commence by examining the development and status of the law governing drainage of surface waters. In that connection we first delineate the scope of the term "surface water," a term which has caused some confusion in the past.

Many jurisdictions have classified drainage problems according to whether the water drained (1) is composed of spring water, rain or snow melt spreading over the land without pattern or order, *i.e.*, "diffused surface water," or (2) travels a clearly defined channel and hence is a watercourse. *See e.g., Garbarino v. Van Cleave*, 214 Or. 554, 330 P. 2d 28 (1958). Based on such classification some courts have applied different rules of law. 5 R. Clark, Waters and Water Rights § 450.5 (1972). We see no basis for such a distinction. "What difference does it make, in principle, whether the water comes

directly upon the field from the clouds above, or has fallen upon remote hills, and comes thence in a running stream upon the surface, or rises in a spring upon the upper field and flows upon the lower." *Gormley v. Sanford*, 52 Ill. 158 (1869).

[1]   Such technical distinctions have unnecessarily complicated the analysis of drainage problems, masking the truly critical issues. Hence, in the past this Court, for purposes of analyzing drainage problems, has combined diffuse surface waters, watercourses and over-flow waters from the ocean into the broader category of *surface waters. Compare Davis v. R.R.*, 227 N.C. 561, 42 S.E. 2d 905 (1947), *with City of Kings Mountain v. Goforth*, 283 N.C. 316, 196 S.E. 2d 231 (1973), *and Midgett v. Highway Commission*, 260 N.C. 241, 132 S.E. 2d 599 (1963); *accord*, Clark, *supra* § 450.5. We approve of this method of analysis and adhere to it. With this definition of "surface waters" in mind, we now discuss the various legal rules applicable to surface water drainage.

[2]   American courts have developed three distinct doctrines governing the disposal of surface waters. The first, *the common enemy rule*, states substantially that "[s]urface water is recognized as a common enemy, which each proprietor may fight off or control as he will or is able, either by retention, diversion, repulsion, or altered transmission; so that no cause of action arises from such interference, even if some injury occurs, causing damage." *Borchsenius v. Chicago, St. P., M.&O. Ry. Co.*, 96 Wis. 448, 71 N.W. 884 (1897); Clark, *supra* § 450.6; *see* Annot., 59 A.L.R. 2d 421 (1958). Grounded in the maxim *cujus est solum, ejus est usque ad coelum et ad inferos* (whose is the soil, his is even to the skies and to the depths below), the doctrine is based on two concepts: "(1) the necessity for improving lands with the recognition that some injury results from even minor improvements, and (2) philosophical preference for freedom of each landowner to deal with his own land essentially as he sees fit." Clark, *supra* § 451.1. Despite these laudable goals the rule created many problems. In the words of one commentator: ". . . landowners are encouraged to engage in contests of hydraulic engineering in which might makes right, and breach of the peace is often inevitable." Maloney and Plager, Diffused Surface Water: Scourge or Bounty?, 8 Nat. Res. J. 73 (1968); *accord, Butler v. Bruno,* 115 R.I. 264, 341 A. 2d 735 (1975). The extreme consequences occasioned by strict application of the common enemy rule soon led many courts to adopt modifications based upon concepts of reasonable use or negligence. Note, Disposition of Diffused Surface Waters in North Carolina, 47 N.C.L. Rev. 205 (1968); *e.g., Stacy v.*

*Walker,* 222 Ark. 819, 262 S.W. 2d 889 (1953); *Mason v. Lamb,* 189 Va. 348, 53 S.E. 2d 7 (1949). While courts have couched modifications of the common enemy rule in different language, the principle in substance is that a landowner is privileged to use and improve his land for proper purposes even though the natural flow of surface water is thereby altered so long as he uses reasonable care to avoid causing unnecessary harm to others. Kinyon and McClure, Interferences with Surface Waters, 24 Minn. L. Rev. 891 (1940), and cases cited.

[3]    The second doctrine, commonly called the *civil law rule,* is, in its purest form, opposed to the common enemy rule. Based on the quoted maxim *aqua currit et debet currere, ut currere solebat* (water flows and as it flows so it ought to flow), the civil law rule subjects a landowner to liability whenever he interferes with the *natural flow* of surface waters to the detriment of another in the use and enjoyment of his land. Kinyon and McClure, *supra.* Various rationales have been advanced in support of this rule. Many courts have simply felt that, as it was necessary to have some rule establishing rights and duties in regard to surface water disputes, it was reasonable and just to follow the law of nature. It was said early in *Gormley v. Sanford, supra,* that "[a]s water must flow, and some rule in regard to it must be established where land is held under the artificial titles created by human law, there can clearly be no other rule at once so equitable and so easy of application as that which enforces nature's laws. There is no surprise or hardship in this, for each successive owner takes whatever advantages or inconveniences nature has stamped upon his land." Other courts have chosen the civil law rule in order to avoid the element of contest or force inherent in the common enemy rule. *Mayor of Albany v. Sikes,* 94 Ga. 30, 20 S.E. 257 (1894).

Nevertheless, since almost any use of land involves some change in drainage and water flow, courts have found that a strict application of civil law principles discourages proper improvement and utilization of land. Thus courts have modified the rule to permit the reasonable use of land. *See* Annot., 59 A.L.R. 2d 421 (1958). For the most part such changes have been piecemeal responses to specialized situations. One modification frequently found in civil law jurisdictions arises when one owner discharges surface waters on the lands of another by artificial means. Faced with this situation courts have often held, with minor variations, that the upper owner may deposit surface water by artificial means into a natural drainway even though the amount of water flowing into adjoining land is

thereby increased. *E.g., Lambert v. Alcorn*, 144 Ill. 313, 33 N.E. 53 (1893); *Miller v. Hester*, 167 Iowa 180, 149 N.W. 93 (1914); *Mizzell v. McGowan*, 120 N.C. 134, 26 S.E. 783 (1897).

Some courts, however, have announced more general modifications. The Maryland court at one time fashioned a special hardship rule, stating: "[A] strict application of [the civil law rule] might result in very great hardship on the lower land owner, who would thereby be prevented from improving his land or using it as he would otherwise have a right to use it. In cases where such hardship would necessarily ensue to one or the other of the owners, courts have sometimes adopted what may be called a 'reasonableness of use' rule. . . . The case before us presents a state of facts in which the rule of reasonableness of use is applicable." *Whitman v. Forney*, 181 Md. 652, 31 A. 2d 630 (1943).

Perhaps the most comprehensive modification of the civil law rule was undertaken in the California case of *Keys v. Romley*, 64 Cal. 2d 396, 412 P. 2d 529, 50 Cal. Rptr. 273 (1966). There the court noted that California traditionally adheres to the civil law rule, yet observed that:

> ". . . [N]o rule can be applied by a court of justice with utter disregard for the peculiar facts and circumstances of the parties and properties involved. No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability.
>
> It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface water. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.
>
> If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule."

[4] The third doctrine of surface water disposition is known as the *reasonable use rule*. Briefly, this rule allows each landowner to

make reasonable use of his land even though, by doing so, he alters in some way the flow of surface water thereby harming other land-owners. Liability is incurred only when this harmful interference is found to be unreasonable. *City of Franklin v. Durgee*, 71 N.H. 186, 51 A. 911 (1901); *Armstrong v. Francis Corp.*, 20 N.J. 320, 120 A. 2d 4 (1956); *Enderson v. Kelehan*, 226 Minn. 163, 32 N.W. 2d 286 (1948); *see generally*, Clark, *supra* § 453. Reasonableness is a question of fact for the jury. Kinyon and McClure, *supra*.

Although sometimes denominated as a "new" or "emerging" doctrine, the rule of reasonable use traces its origin to the mid-nineteenth century. In *Basset v. Company*, 43 N.H. 569 (1862), the New Hampshire Supreme Court first took note of conflicts inherent in any rigid inflexible system of rules applied to drainage issues. The court there said:

> "No land-owner has an absolute and unqalified right to the unaltered natural drainage or percolation to or from his neighbor's land. In general it would be impossible for a land-owner to avoid disturbing the natural percolation or drainage, without a practical abandonment of all improvement or beneficial enjoyment of his land. Any doctrine that would forbid all action of a landowner, affecting the relations as to percolation or drainage between his own and his neighbors' land, would in effect deprive him of his property . . ."

For this reason the court held that ". . . in the drainage a man may exercise his own right on his own land as he pleases, provided he does not interfere with the rights of others. The rights are cor-relative, and, from the necessity of the case, the right of each is only to a reasonable user or management. . . ."

After considerable struggle the Minnesota court adopted a similar rule. *See Sheehan v. Flynn*, 59 Minn. 436, 61 N.W. 462 (1894); *Enderson v. Kelehan, supra*. Although these jurisdictions were for many years the sole adherents to the reasonable use rule, a growing number have recently adopted the rule fully, *e.g.*, *Weinberg v. Northern Alaska Development Corp.*, 384 P. 2d 450 (Alaska, 1963); *Rodrigues v. State*, 52 Haw. 156, 472 P. 2d 509 (1970); *Armstrong v. Francis Corp., supra; Jones v. Boeing Company*, 153 N.W. 2d 897 (N.D. 1967); *Butler v. Bruno, supra; Sanford v. University of Utah*, 26 Utah 2d 285, 488 P. 2d 741 (1971); *State v. Deetz*, 66 Wis. 2d 1, 224 N.W. 2d 407 (1974), or in part, *Lunsford v. Stewart*, 95 Ohio App. 383, 120 N.E. 2d 136 (1953); *Mulder v. Tague*, 85 S.D. 544, 186 N.W. 2d 884 (1971); *City of Houston v. Renault, Inc.*, 431 S.W. 2d 322 (Tex. 1968).

In addition, several states have approved modifications of the common enemy or the civil law rule approaching actual adoption of the reasonable use rule. *See Keys v. Romley, supra; Templeton v. Huss*, 57 Ill. 2d 134, 311 N.E. 2d 141 (1974); *Commonwealth, Dept. of Hwys. v. S & M Land Co., Inc.*, 503 S.W. 2d 495 (1972); *Baer v. Board of County Com'rs of Washington Co.*, 255 Md. 163, 257 A. 2d 201 (1969); *Morris v. McNicol*, 83 Wash. 2d 491, 519 P. 2d 7 (1974).

The rising prominence of the reasonable use rule is seemingly attributable to the increasing industrialization and urbanization of the nation. Where people are forced by social and demographic pressures to live in close proximity with each other and with commercial and industrial development, there will be, of necessity, increased conflict over the proper utilization of land. Long and Long, *Surface Waters and the Civil Law Rule*, 23 Emory L.J. 1015 (1974). It is no longer simply a matter of balancing the interests of individual landowners; the interests of society must be considered. On the whole the rigid solutions offered by the common enemy and civil law rules no longer provide an adequate vehicle by which drainage problems may be properly resolved. For this reason courts have responded, first with modifications of existing rules and then, when those proved unwieldy, by the adoption of the rule of reasonable use.

[3] North Carolina has long adhered to the civil law rule. *See* Note, Disposition of Diffused Surface Waters in North Carolina, 47 N.C.L. Rev. 205 (1968). In *Porter v. Durham*, 74 N.C. 767 (1876), this Court held:

> ". . . [A]n owner of lower land is obliged to receive upon it the surface-water which falls on adjoining higher land, and which naturally flows on the lower land. Of course, when the water reaches his land the lower owner can collect it in a ditch and carry it to a proper outlet so that it will not damage him. He cannot, however, raise any dike or barrier by which it will be intercepted and thrown back on the land of the higher owner."

As we have noted, this rule applies whether the drainage technically involves diffuse surface water, *Phillips v. Chesson*, 231 N.C. 566, 58 S.E. 2d 343 (1950); *Davis v. R.R., supra; Winchester v. Byers*, 196 N.C. 383, 145 S.E. 774 (1928); *Staton v. R.R.*, 109 N.C. 337, 13 S.E. 933 (1891); or a natural watercourse, *City of Kings Mountain v. Goforth, supra; Midgett v. Highway Commission, supra; Clark v. Guano Co.*, 144 N.C. 64, 56 S.E. 858 (1907); *Mizzell v. McGowan*, 120 N.C. 134, 26 S.E. 783 (1897); *Porter v. Durham, supra; accord, Jones v. Loan Association*, 252 N.C. 626, 114 S.E. 2d 638 (1960).

Nevertheless, North Carolina has found, like other states, that in a changing society dogmatic adherence to this rule is unfeasible and unwise. Thus the Court early committed itself to a policy of flexible application of the civil law rule. Note, Disposition of Diffused Surface Waters in North Carolina, 47 N.C.L. Rev. 205 (1968). This policy was stated clearly and succinctly by Chief Justice Faircloth in *Mizzell v. McGowan, supra*:

> "The upper owner can not divert and throw water on his neighbor, nor the latter back water on the other with impunity. *Sic utere tuo, ut alienum non laedas.* [Use your own property in such a manner as not to injure that of another]. This rule, however, can not be enforced in its strict letter, without impeding rightful progress and without hindering industrial enterprise. Minor individual interest must sometimes yield to the paramount good. Otherwise the benefits of discovery and progress in all the enterprises of life would be withheld from activity in life's affairs. 'The rough outline of natural right or liberty must submit to the chisel of the mason that it may enter symmetrically into the social structure.' Under this principle the defendants are permitted not to divert, but to drain their lands, having due regard to their neighbor, provided they do not more than concentrate the water and cause it to flow more rapidly and in greater volume down the natural streams through or by the lands of the plaintiff."

Another example of this Court's flexible approach to water law problems is found in *Yowmans v. Hendersonville*, 175 N.C. 574, 96 S.E. 45 (1918). In that case there was evidence tending to show that, by the grading and paving of streets, the City of Hendersonville diverted water onto plaintiff's lot causing damage. The trial court charged the jury that plaintiff should recover if the jury found that defendant had "diverted upon plaintiff's property more water than would naturally flow there, causing damage. . . ." This Court noted that the charge adequately stated the law as between private owners or public service corporations, but pointed out that:

> ". . . in regard to the flow and disposal of surface water incident to the grading and pavement of streets, a different rule is recognized, and a municipality, acting pursuant to legislative authority, is not ordinarily responsible for the increase in the flow of water upon abutting owners unless there has been negligence on their part causing the damage complained of. The right to change the grade of the streets and to improve the same, according to modern and generally approved methods,

passed to the municipality in the original dedication and may be exercised by the authorities as the good of the public may require. It is held in this jurisdiction, however, that the right referred to is not absolute, but is on condition that the same is exercised with proper skill and caution. . . ."

As these decisions illustrate, this Court has generally adhered to the civil law rule yet has not hesitated to modify that rule where time and circumstance so required.

A similar situation, demonstrating the Court's willingness to modify water law in response to social change, arose during the development of the law of riparian rights. *See generally* Aycock, Introduction to Water Use Law in North Carolina, 46 N.C.L. Rev. 1 (1967). Like the laws of drainage, riparian rights were early expressed in terms of the "natural flow" rule. By this rule an owner of lands abutting a stream had the right to have the flow continue through his land undiminished in quantity or quality except for such "natural uses" as drinking, bathing, watering farm animals and irrigation of home supportive gardens. Industrial use was permitted only insofar as the water was returned to the stream without substantial diminution in quality or quantity. Although adequate early in our history, this rule was soon outmoded by the needs of a growing urban and industrial society. This Court therefore adopted the "American rule" or rule of reasonable use that a "riparian proprietor is entitled to the natural flow of a stream running through or along his land in its accustomed channel, undiminished in quantity and unimpaired in quality, except as may be occasioned by the reasonable use of the water by other like proprietors." *Smith v. Morganton*, 187 N.C. 801, 123 S.E. 88 (1924); *accord, Pugh v. Wheeler*, 19 N.C. 50 (1836).

This rule was expounded upon in *Dunlap v. Light Co.*, 212 N.C. 814, 195 S.E. 43 (1938). There the Court said:

"The right of a riparian proprietor to the natural flow of a stream running through or along his land in its accustomed channel undiminished in quantity and unimpaired in quality, is qualified by the right of other riparian owners to make a reasonable use of such water as it passes through or along their lands. In determining the rights of a lower riparian owner, the question is whether the upper riparian proprietor is engaged in a reasonable exercise of his right to use the stream as it flows by or through his land, whether with or without retaining the

water for a time, or obstructing temporarily the accustomed flow.

  . . . The rights of riparian owners in a running stream above and below are equal; each has a right to the reasonable use and enjoyment of the water, and each has a right to the natural flow of the stream subject to such disturbance and consequent inconvenience and annoyance as may result to him from a reasonable use of the waters by others. There may be a diminution in quantity or a retardation or acceleration of the natural flow indispensable for the general valuable use of the water perfectly consistent with the existence of the common right and this may be done so long as the retardation and acceleration is reasonably necessary in the lawful and beneficial use of the stream. . . .

  What constitutes a reasonable use is a question of fact having regard to the subject matter and the use; the occasion and manner of its application; its object and extent and necessity; the nature and size of the stream; the kind of business to which it is subservient; and the importance and necessity of the use claimed by one party and the extent of the injury caused by it to the other."

Thus our Court adopted a flexible rule of reasonable use with regard to the rights and duties of riparian owners where such a position was mandated by basic long-term change in the social and economic structure of society.

With this background of the law, we now turn to plaintiffs' first contention, to wit, that the court erred by instructing the jury on the law of nuisance rather than restricting its instructions to the duties of a lower landowner to receive water from the upper owner.

[5] By his charge the judge instructed the jury to determine whether defendants engaged in tortious conduct amounting to a private nuisance. In substance, this part of the charge amounts to an instruction in accord with the rule of reasonable use. As noted previously, North Carolina has traditionally adhered to a modified civil law doctrine. *Midgett v. Highway Commission, supra.* Thus, on its face the charge of the trial judge, with emphasis on the reasonableness of the defendants' actions, is an incorrect statement of the law. Defendants, however, argue that a nuisance analysis is "useful in situations such as this case presents because it requires of the fact finder a consideration of the reasonableness of the defendant's conduct in light of all the circumstances." In effect, de-

Pendergrast v. Aiken

fendants argue that this Court should abandon the civil law rule in favor of the rule of reasonable use. For the reasons which follow, we agree.

In this jurisdiction, as already noted, various modifications of the strict civil law doctrine have been made, case by case, to permit the reasonable use of land. Doubtless the evolution of the law could continue in such piecemeal fashion. This method of change, however, has left a legacy of contradiction and confusion in our law, regarding the drainage of surface water.

The nature of this confusion and its cause are revealed by examination of the methods by which drainage law problems have been analyzed. The civil law doctrine has historically been regarded as a species of property law. Thus most courts have articulated the doctrine through property law concepts such as rights, servitudes, easements, and so forth. *E.g., Clark v. Guano Co., supra; see* Comment, The Application of Surface Water Rules in Urban Areas, 42 Mo. L. Rev.  76 (1977). These property concepts are rigid and absolute in nature and, while they are appropriate where the civil law doctrine is strictly applied, they serve as an impediment where it becomes necessary to modify the doctrine to accommodate changing social and economic needs. Kinyon and McClure, Interference with Surface Waters, 24 Minn. L. Rev. 891 (1940).

The resulting inflexibility presents a particularly difficult problem in drainage cases. In an era of increasing urbanization and suburbanization, drainage of surface water most often becomes a subordinate feature of the more general problem of proper land use — a problem acutely sensitive to social change. Since property concepts do not easily admit of modification, many courts, *ours included*, have responded by making exceptions to the rule on a case-by-case basis, *e.g., Mizzell v. McGowan, supra*, or by adjusting the theory of the action in a particular case to achieve a just result, *compare City of Kings Mountain v. Goforth, supra, with Midgett v. Highway Commission, supra; Davis v. R.R., supra, and Johnson v. Winston-Salem*, 239 N.C. 697, 81 S.E. 2d 153 (1954).

The adoption of exceptions, most of which incorporate some element of reasonable use, has resulted in uncertainty of the law and reduced predictability which is a chief virtue of the civil law rule. *Butler v. Bruno, supra*. Adjustments in the theory of the action tend to cause confusion when courts are required to pass on the applicability of statutes of limitation or the availability of other defenses such as contributory negligence or easement by prescrip-

tion. Maloney and Plager, Diffused Surface Water: Scourge or Bounty?, 8 Nat. Res. J. 72 (1968). Our decisions seem to provide clear guidance to attorneys and trial courts only in a case where the facts are on "all fours" with the facts of a previously decided case. Hence it is understandable that, as later appears, the able trial judge in the case before us charged on both the civil law rule and the reasonable use rule!

We believe the reasonable use doctrine affords a sounder approach to the problems presented by surface water drainage. It can be applied effectively, fairly and consistently in any factual setting, *Butler v. Bruno, supra,* and thus has the capacity to accommodate changing social needs without occasioning the unpredictable disruptions in the law associated with our civil law rule.

Other advantages of the reasonable use rule, particularly those relating to evidentiary aspects, are less obvious though no less important. Under the civil law rule it is crucial to determine the "natural flow" of the surface water. The continual process of construction and reconstruction, a hallmark of our age, has made it increasingly difficult to determine accurately how surface waters flowed "when untouched and undirected by the hand of man." *City of Houston v. Renault, Inc., supra.* Adoption of the reasonable use rule obviates the necessity of making such a finding. *See* Comment, The Application of Surface Water Rules in Urban Areas, 42 Mo. L. Rev. 76 (1977). In sum, we think the reasonable use rule is more in line with the realities of modern life and that consistency, fairness and justice are better served through the flexibility afforded by that rule.

Accordingly, we now formally adopt the rule of reasonable use with respect to *surface water drainage.* That rule is expressed as follows: Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface water is altered thereby and causes some harm to others, but liability is incurred when his harmful interference with the flow of surface waters is unreasonable and causes substantial damage. *Armstrong v. Francis Corp., supra; accord, Weinberg v. Northern Alaska Development Corp., supra.*

Analytically, a cause of action for unreasonable interference with the flow of surface water causing substantial damage is a private nuisance action, with liability arising where the conduct of the landowner making the alterations in the flow of surface water is either (1) intentional and unreasonable or (2) negligent, reckless or in the course of an abnormally dangerous activity. *See* Restatement

of Torts, § 833 (1939); Restatement (Second) of Torts § 822 (Tent. Draft No. 17, 1971); *accord, Watts v. Manufacturing Co.*, 256 N.C. 611, 124 S.E. 2d 809 (1962); *Morgan v. Oil Co.*, 238 N.C. 185, 77 S.E. 2d 682 (1953); *City of Houston v. Renault, Inc., supra; Sanford v. University of Utah, supra; State v. Deetz, supra.*

Most nuisances of this kind are intentional, usually in the sense that "the defendant has *created or continued* the condition causing the nuisance with full knowledge that the harm to the plaintiff's interests is substantially certain to follow." (Emphasis added.) W. Prosser, Law of Torts § 87 (4th Ed. 1971). Other nuisances may arise from negligence as, for example, where the defendant negligently permits otherwise adequate culverts replacing natural drainways to become obstructed, *Johnson v. City of Winston-Salem*, 239 N.C. 697, 81 S.E. 2d 153 (1954); *Price v. R.R.*, 179 N.C. 279, 102 S.E. 308 (1920).

[6] Regardless of the category into which the defendant's actions fall, the reasonable use rule explicitly, as in the case of intentional acts, or implicitly, as in the case of negligent acts, requires a finding that the conduct of the defendant was unreasonable. This is the essential inquiry in any nuisance action. *See Watts v. Manufacturing Co., supra; Morgan v. Oil Co., supra.*

Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant. *Armstrong v. Francis Corp., supra; State v. Deetz, supra;* Restatement (Second) of Torts § 826 (Tent. Draft No. 18, 1972). Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence. *Rodrigues v. State, supra; Armstrong v. Francis Corp., supra; Watts v. Manufacturing Co., supra; Jones v. Boeing, supra;* Restatement of Torts §§ 829-831 (1939); Restatement (Second) of Torts §§ 827, 828 (Tent. Draft No. 17, 1971); Restatement (Second) of Torts § 829A (Tent. Draft No. 18, 1972); Note, 50 Ky. L.J. 254 (1961-62).

[7] We emphasize that, even should alteration of the water flow by the defendant be "reasonable" in the sense that the social utility

arising from the alteration outweighs the harm to the plaintiff, defendant may nevertheless be liable for damages for a private nuisance "if the resulting interference with another's use and enjoyment of land is greater than it is reasonable to require the other to bear under the circumstances without compensation." *See* Restatement (Second) of Torts (Tent. Draft No. 17, 1971); Restatement (Second) of Torts §§ 826, 829A (Tent. Draft No. 18, 1972). The gravity of the harm may be found to be so significant that it requires compensation regardless of the utility of the conduct of the defendant.

As the New Jersey court perceptively noted in *Armstrong v. Francis Corp., supra*:

"... [W]hile today's mass home building projects ... are assuredly in the social good, no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit. Social progress and the common well-being are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason."

We do not view the formal adoption of the rule of reasonable use as an innovation in the law of North Carolina. In the past, modifications in drainage water law have been piecemeal as required by time and circumstance. Our action today simply recognizes that fact and approves a rule by which adjustments in the rights and duties of landowners may be made fairly and justly without disrupting the consistency of the law. Thus we adopt the reasonable use rule as an act of clarification— not innovation.

We now consider the charge of the trial judge to determine whether he correctly instructed the jury. In relevant part the judge instructed as follows:

"Now, the first issue: did the defendants Aiken create a nuisance by installing and covering a 36-inch drain across their property. In order to answer that issue with any intelligent approach to it, you must know what is meant by the use of the word 'nuisance' as applied in that issue. Now I instruct you that the law provides that every owner of land has a right to be free from interference with the use and enjoyment of his land. When one person by the improper use of his land does injury to the

land, property, or rights of another, although he does not actually physically trespass upon such property, that conduct constitutes a private nuisance. In order for the plaintiff in this case to recover for a private nuisance, the conduct complained of, that is, the conduct that the plaintiffs say that the Aikens did, that conduct must be unreasonable, and there must be a substantial invasion of the plaintiffs' interest in the private use and enjoyment of their property although the defendants did not actually trespass upon the plaintiffs' property. It must work some substantial injury to the plaintiffs' property. The law of private nuisance rests upon the concept that every person should use his own property as not to injure the property of another.

As a consequence, a private nuisance exists in a legal sense when one person makes an improper use of his own property and in that way injures the land or property of his neighbor. An invasion of another's interest in the use and enjoyment of his land is intentional in the law of private nuisance when the person whose conduct is in question has a basis for liability actionable in the purpose in causing it, or knows that it is resulting from his conduct, or knows that it is substantially certain to result from his conduct. A person who intentionally creates or maintains a private nuisance is liable for the resulting injury to others regardless of the degree of care or skill exercised by him to avoid such injury.

Now, members of the jury, conduct may be a nuisance by reason of its location or the manner in which it is constructed, maintained, or operated. For there to be liability, the defendants Aikens' conduct must have been unreasonable, and such unreasonable conduct must have caused substantial injury to the plaintiffs Pendergrasts' property. In determining if the defendants Aikens' conduct was unreasonable, you are to consider all of the circumstances of this case. The question is not whether a reasonable person in the plaintiffs' or the defendants' position would regard the conduct as unreasonable, but whether reasonable persons in general looking at the whole situation impartially and objectively would consider it unreasonable. Some of the circumstances which you should consider on the question of the reasonableness of the defendants' conduct include the defendants' conduct itself, the character of the neighborhood, the relationship of the properties in question, the nature, utility and social value of both plaintiffs' and

defendants' use of their land, the extent, nature and frequency of the alleged harm to the plaintiffs' interest. All of the circumstances in the case must be considered."

To this point the instruction, though somewhat rough, is substantially in accord with the rule of reasonable use as applied to the facts of this case. The trial judge went on, however, to state:

"Now one of the circumstances existing from the evidence in the case is the relationship of the two pieces of property; one being that of the plaintiffs, being an upper property, and that of the defendants being a lower property in speaking of the flow of the water. The water first comes to Mr. Pendergrast's property and then goes to the Aikens' property. So the Pendergrasts own what is known as the upper estate, and the Aikens own the lower estate.

Now the law confers on the owner of an upper estate of land an easement, or servitude, in the lower estate for the drainage of surface waters flowing in its natural course and manner without obstruction or interruption by the owners of the lower estate to the detriment or injury of the upper estate. Each of the lower parcels along the drainway are servient to those on the higher level to the extent that each is required to receive and allow passage of the natural flow of surface water from the higher land. As servient to the upper estate, the defendants are not permitted by law to interrupt or prevent the natural passage of the water in the event it causes damage to the upper estate. Where a lower estate, such as the Aikens' in this case, presumably for their own convenience and for the better enjoyment of their property, closed the natural depression and channel through which the water from the upper dominant tenement had been accustomed to flow and installed in lieu thereof an underground culvert or conduit, the law imposed upon the defendants' ownership the burden of installing a pipe of sufficient size to accommodate the natural flow of surface water from the upper tenement across the defendants' land without injury to the upper tenement's property."

[8] By this latter statement the trial judge departed from the reasonable use rule and, using such property terms as easement and servitude, reverted to the civil law rule. The juxtaposition of reasonable use and civil law concepts placed contradictory instructions before the jury and could have no other effect than to confuse and mislead it. In that respect there was error in the charge. *See*

*Hardee v. York*, 262 N.C. 237, 136 S.E. 2d 582 (1964); *Hubbard v. Southern R. Co.*, 203 N.C. 675, 166 S.E. 802 (1932).

[9] We now turn to the second issue raised by plaintiffs' assignment of error, that is, did the court err in instructing the jury that it must first determine whether defendant created a nuisance, and then separately decide whether plaintiffs were harmed thereby.

In his original charge the trial judge instructed the jury that it must determine whether defendants created a nuisance. The court then told the jury that, should it answer that issue yes, it would "take up and consider the second issue, that issue being: if so, did the defendants Aiken thereby cause damage to the plaintiffs' property. Another way of saying that issue is: if you find that a nuisance was created, did the nuisance damage the plaintiffs' property." Later, in reply to a direct question from the foreman of the jury, the trial judge stated that the jury could answer the first issue yes and the second issue no.

The court erred in these instructions. The jury could not find that a nuisance existed at all without a finding of substantial damage to plaintiffs. *Midgett v. Highway Commission*, 265 N.C. 373, 144 S.E. 2d 121 (1965); *Watts v. Manufacturing Co., supra.* This is so because "[e]ach individual in a community must put up with a certain amount of annoyance, inconvenience or interference, and must take a certain amount of risk in order that all may get on together." *Watts v. Manufacturing Co., supra.* Indeed the judge in one part of his charge instructed the jury that a finding of substantial injury to the plaintiff was a necessary element of a finding that a private nuisance existed.

Thus it was error to instruct the jury that it might answer the first issue yes and the second no. When the jury returned such a verdict it was hopelessly contradictory and its true meaning could not be determined. *See Cody v. England*, 216 N.C. 604, 5 S.E. 2d 833 (1939). Because of the possibility of such a meaningless verdict, this Court has previously noted in *obiter dictum* that a submission of the second issue, in a private nuisance case, is itself error. *Watts v. Manufacturing Co., supra.*

[10] The third issue raised by plaintiffs' assignment of error concerns the court's supplemental instructions on the effect of the two 24-inch culverts under Allen Avenue. These instructions arose from the following colloquy:

"FOREMAN: . . . Our question really concerns the release of the water from the Aiken property onto Allen Street ver-

sus—in other words, if the release of the water onto Allen Street is limited beyond the limitation placed by the Aiken property, how that would affect it.

COURT: Now let me see if I can answer your question. Is your question this: if there is more water coming off of the Aiken property than the Allen Street culverts can handle, how does that affect the lawsuit?

FOREMAN: Yes, sir.

COURT: Speaking about the two twenty-four inch culverts going under Allen Street.

FOREMAN: If the thirty-six inch culvert releases more water than the two twenty-fours will handle, therefore it's backed up because of that, how does that affect it?

COURT: Well, let me say this: now the plaintiffs have the burden of proof on each issue, and the plaintiffs have the burden to prove that by the installation and covering of the thirty-six inch culvert the defendants created a nuisance, and that the creation of that nuisance is what caused the damage to their property.

COURT: Now, if the jury finds that the plaintiffs have failed to prove that the creation—well, first of all they've got to prove there's a nuisance. If you find that they do prove that there's a nuisance, now then if you fail to find that the plaintiffs have satisfied you that they were damaged as a result of the creation of the nuisance, then the plaintiffs cannot prevail. Now if the jury finds that the plaintiffs' damage is not caused by the creation of a nuisance by the defendant, assuming that you find they have created a nuisance—I don't mean to infer what your verdict should be on that issue, but if you find that the damage was not caused by the creation of a nuisance, but was caused by something further downstream, then the plaintiffs could not recover."

In passing we note the trial judge again erred in instructing the jury that it must determine substantial damages apart from its determination of the existence of a nuisance. Of more immediate concern, however, is that part of the instruction stating ". . . but if you find that the damage was not caused by the creation of a nuisance, but was caused by something further downstream, then the plaintiffs could not recover."

As an abstract concept of law this statement is correct and, were there some evidence that the downstream 24-inch culverts caused the water to back onto plaintiffs' land, the instruction would have been entirely proper. Here, however, there was neither allegation nor proof that the 24-inch culverts under Allen Avenue caused the flooding of plaintiffs' land. In fact, all evidence is to the contrary. John Pendergrast, a named plaintiff, testified that the water had never before backed up on plaintiffs' land although it had flooded the southern part of defendants' land. Numerous witnesses confirmed this testimony. Walter Bearden, an expert in the field of civil engineering, testified that the 36-inch culvert emplaced by the defendant was "completely inadequate to carry the water." Moreover, there is evidence that water continued to back onto the plaintiffs' land after the 24-inch culverts had been replaced by 60-inch culverts.

A court errs in charging upon a principle of law which is not presented by the pleadings and which does not arise from the evidence. *Motor Freight v. DuBose*, 260 N.C. 497, 133 S.E. 2d 129 (1963). Under the pleadings and evidence in this case the effect, if any, of the two 24-inch culverts had no legal significance relative to the dispute between the plaintiffs and defendants and the court erred in instructing the jury that it might consider the inadequate drainage from the Aiken land.

The judge had a positive duty to instruct the jury on all substantial matters arising from the evidence, whether or not requested to do so. *See generally* 7 N.C. Index 2d, Trial § 33. As applied to this case, this principle obligated the court, upon the jury's inquiry, to instruct it not to consider the inadequacies of the Allen Avenue drainage in deciding whether defendants had wrongfully diverted the flow of surface waters upon plaintiffs' land. This the court did not do.

For errors committed, there must be a

New trial.