PAGE MOTOR COMPANY, INC. *v.* GEORGE P. BAKER ET AL.

BOGDANSKI, PETERS, PARSKEY, WRIGHT and O'DONNELL, Js.

Submitted on the briefs October 16—decision released December 16, 1980

*Richard A. Schatz,* on the brief, for the appellant (plaintiff).

*Louis B. Blumenfeld,* on the brief, for the appellees (defendants).

WRIGHT, J. In this case the basic facts are not in dispute. The defendants are trustees of the property of the Penn Central Transportation Company (hereinafter Penn Central). Penn Central, in 1972, was the owner of property lying northerly of properties owned and rented by the plaintiff, Page Motor Company, Inc. (hereinafter Page Motors). Both properties were on the northerly side of Bridgeport Avenue (also known as the Boston Post Road) in the town of Milford. The land contours are such that the land slopes down from the Boston Post Road to the Penn Central property, which property is a raised embankment on the top of which are railroad tracks. The Page Motors' property is on the down slope between the Boston Post Road and the railroad.

The natural flow of surface water in the area is from south of the Boston Post Road, across the road, down the slope (on which is situated Page Motors) and to the base of the embankment. There is a stone culvert in the Penn Central embankment through which surface water flows at times, and

from there it continues northerly across a swamp, through a ten inch pipe under a dirt service road and into Beaver Brook.

On June 18, 1972, and June 19, 1972, there was a major rainstorm in the area. The storm deposited approximately 7.16 inches of rain on the area in a twenty-nine hour period, beginning around noon on June 18, 1972, and ending by 5 p.m. on June 19, 1972. As a result of this storm, the area just south of the Penn Central property filled with water which rose onto a lot near the tracks on which Page had stored new automobiles. Forty-nine such vehicles were damaged. By stipulation of the parties, the damage to the vehicles was $39,284.04.

For many years prior to June 19, 1972, Penn Central owned, possessed, maintained and controlled the railroad culvert. For at least eighteen months prior to June 19, 1972, Penn Central did not inspect the culvert. It is the contention of the plaintiff that the flooding was due to the clogged condition of the culvert.

The trial referee made the following finding of facts in his decision: "It is important to note that the instant case deals with 'surface water' and that the surface water which created the flooding did not come from Penn Central property. 'Surface waters are those casual waters which accumulate from natural sources and which have not yet evaporated, been absorbed into the earth, or found their way into a stream or lake.' *Taylor* v. *Conti,* 149 Conn. 174, 178 [177 A.2d 670 (1962)]. Each eyewitness to the flooding who testified in this case was asked the source of the flood waters. Each testified that the water creating the flooding south of the culvert was either falling from the sky or flowing

down the slope from the Boston Post Road. All expert witnesses agreed that no significant amount of water came from the Penn Central property." An examination of the record reveals that this finding of facts cannot be disturbed.

Although much of the trial referee's decision deals with the history of the law on the rights of neighboring landowners in connection with surface waters, and particularly with the common enemy doctrine, the finding of facts is dispositive of this appeal. In view of the fact that the plaintiff was not able to prove that any acts by the defendants *caused* the damage to the plaintiff's automobiles, no liability can be assessed against the defendants. "Negligence is not a tort unless it results in the commission of a wrong . . . ." *Palsgraf* v. *Long Island Railroad Co.*, 248 N.Y. 339, 345, 162 N.E. 99 (1928).

We feel constrained, however, to comment upon the closing words of the trial referee in his opinion: "I conclude that Penn Central had an absolute right to repel the surface [waters] here involved by direct, intentional conduct or carelessness. As such, no duty was owed Page Motors." While the trial referee was correct in his analysis of the legal history of the common enemy doctrine, we feel that the time has come to alleviate the harshness of that doctrine.

The so-called common enemy doctrine, briefly stated, is that the owner of land may repel or divert surface waters from its land on to that of another. *Chadeayne* v. *Robinson*, 55 Conn. 345, 11 A. 592 (1887); *Grant* v. *Allen*, 41 Conn. 156 (1874). The court in *Tide Water Oil Sales Corporation* v. *Shimelman*, 114 Conn. 182, 158 A. 229 (1932), summarized

the law as follows (pp. 189–90): "Speaking generally, our law may be summarized as follows: A landowner is under no duty to receive upon his land surface water from the adjacent properties, but in the use or improvement of it he may repel such water at his boundary. On the other hand, he incurs no liability by reason of the fact that surface water falling or running onto his land flows thence to the property of others in its natural manner. But he may not use or improve his land in such a way as to increase the total volume of surface water which flows from it to adjacent property, or as to discharge it or any part of it upon such property in a manner different in volume or course from its natural flow, to the substantial damage of the owner of that property."

In other words, up to the present time Connecticut has adopted the common-law rule, which is termed in American Law Reports Annotated as the common enemy doctrine. This doctrine attaches to land ownership the privilege to repel surface waters, even though this might increase the burden upon another. In such event, the repelling landowner is excused from liability, in spite of the fact that his conduct may be the proximate cause of the damage.

We now feel that the inflexibility of the old rule, as correctly reported by the trial referee, should be modified so as to allow some reasonable latitude. By way of dictum, we are now inclined to adopt what some jurisdictions have termed the reasonableness of use rule.

Generally, under the rule of reasonable use, the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to

the actor and disadvantage to the adjoining landowners, as well as social utility. Ordinarily, the determination of such reasonableness is regarded as involving factual issues to be determined by the trier. Annot., 93 A.L.R.3d 1193 (superseding 59 A.L.R.2d 421).

The reasonable use rule was apparently first adopted in New Hampshire. Noting the inconvenience which would arise from adopting extreme rules that a landowner has either no right of drainage or an absolute right, the court in *Bassett* v. *Salisbury Mfg. Co.,* 43 N.H. 569 (1862) (which was apparently primarily concerned with percolating waters), said that the sole ground of qualification of the landowners's right of drainage was the similar rights of others. The court went on to say that the extent of the qualification should be determined under the rule of reasonable use, the rights and enjoyment of each landowner being similar and dependent upon the rights and enjoyment of other landowners. In other words, such rights must be exercised with reference to the rights of others. The reasonable use rule as applied to percolating waters was held to apply also to surface waters in *Swett* v. *Cutts,* 50 N.H. 439 (1870).

New Jersey was one of the pioneers in adopting the common enemy doctrine, which was applied in that jurisdiction with considerable strictness. The common enemy rule was abandoned, however, in *Armstrong* v. *Francis Corporation,* 20 N.J. 320, 120 A.2d 4 (1956). The court said that the casting of surface waters from one's own land upon the land of another, in circumstances where the resultant material harm to the other was foreseen or foreseeable, would appear on the face of it to be as tortious

and actionable as was any other unreasonable use of the possessor's land. Concluding that the problems raised by the diversion of surface waters should be approached under tort rather than property concepts, the court declared its adherence to the reasonable use rule, which was said to have the particular virtue of flexibility, since the issue of reasonableness became a question of fact to be determined in each case under a consideration of all the relevant circumstances, including such factors as the amount of harm caused, its foreseeability, the purpose or motive with which the act was done, and the consideration whether the utility of the use of the land outweighed the gravity of the harm resulting. See also *Hopler* v. *Morris Hills Regional District,* 45 N.J. Super. 409, 133 A.2d 336 (1957).

Several other jurisdictions have adopted the rule of reasonable use: *Weinberg* v. *Northern Alaska Development Corporation,* 384 P.2d 450 (Alaska 1963); *Pendergrast* v. *Aiken,* 293 N.C. 201, 236 S.E.2d 787 (1977); *Butler* v. *Bruno,* 115 R.I. 264, 341 A.2d 735 (1975); *Mulder* v. *Tague,* 85 S.D. 544, 186 N.W.2d 884 (1971); *State* v. *Deetz,* 66 Wis. 2d 1, 224 N.W.2d 407 (1974). See also a recognition of this new trend in *Bishop* v. *Richard,* 193 Md. 6, 65 A.2d 334 (1949), and *Battisto* v. *Perkins,* 210 Md. 542, 124 A.2d 288 (1956).

Although we now announce our decision to replace the common enemy doctrine with the rule of reasonable use, we reiterate that our redefinition of the duty of a landowner with respect to foreign surface waters cannot avail the present plaintiff. In this case, the plaintiff cannot recover because it was not

able to establish that the defendants' conduct was a substantial factor in causing the damage it suffered.

There is no error.

In this opinion PETERS and O'DONNELL, Js., concurred.

BOGDANSKI, J. (dissenting). I do not agree that there was no evidence of a causal connection between the defendant's conduct and the plaintiff's damage.

In his memorandum of decision, the trial referee found that there was a stone culvert in the Penn Central embankment through which water flowed to the other side (north and away from the property of the plaintiff), that for many years Penn Central possessed, maintained and controlled that railroad culvert and that for at least eighteen months prior thereto, it did not inspect the culvert to determine if it had clogged. It was the plaintiff's contention that the flooding and damages were caused by water backing up onto the plaintiff's land because of the clogged culvert.

On those factors, causation between the defendants' failure to act as to the culvert and the plaintiff's damage should present no problem. Rather than causation, it appears that the basis of the trial referee's decision was the application of the common enemy doctrine which permits a landowner to repel surface water without incurring liability to adjoining landowners.

The plaintiff requested this court to reject the common enemy doctrine and to substitute a less harsh and more equitable rule. That there are other rules in other jurisdictions was recognized by this

court in *Rutkoski* v. *Zalaski,* 90 Conn. 108, 96 A. 365 (1916). Some jurisdictions have adopted the civil law rule which holds that " 'the right of drainage of surface-waters, as between owners of adjacent lands, of different elevations, is governed by the law of nature. The lower proprietor is bound to receive the waters which naturally flow from the estate above, provided the industry of man has not created or increased the servitude.' " *Rutkoski* v. *Zalaski,* supra, 111. This has sometimes been described as a servitude of natural drainage. Under this doctrine, each owner must leave the natural system undisturbed. The civil law and the common enemy approaches are property based concepts.

The term "common enemy" came into general usage with the 1875 New Jersey decision of *Town of Union* v. *Durkes,* 38 N.J.L. 21 (N.J. 1875), which stated (p. 22), "surface water was the common enemy, which every proprietor may fight and get rid of as best he may." Those states adopting the common enemy rule believed it would foster land development since the developer need not bear the costs to others of his improvements. This doctrine had the virtue of encouraging the improvement of property, a desirable goal in nineteenth century America. The disadvantage of this doctrine was that it meant might made right: The landowner with the greater resources could build the highest embankment and so repel water onto his neighbor's property.

In their strict application, these doctrines led to opposite results. Since they also led to unjust results, many courts modified or made exceptions to them. Some states applied one rule to urban areas and another to rural areas, or incorporated

the tort principles of reasonableness and negligence into their rules. See annot., 93 A.L.R.3d 1193. Commentators have criticized this piecemeal approach as creating a great deal of confusion. Note, 2 W. New Eng. L. Rev. 549 (1980).

Connecticut has also modified the common enemy doctrine by the proposition that a landowner cannot use or improve his land so as to increase the volume of the surface waters which flow from it onto the land of others, nor can he discharge surface waters from his land onto the land of others in a different course from their natural flow, if by so doing he causes substantial damage. *Falco* v. *James Peter Associates, Inc.,* 165 Conn. 442, 335 A.2d 301 (1973); *Taylor* v. *Conti,* 149 Conn. 174, 177 A.2d 670 (1962). This modification does not, however, apply to the present case.

Even though the policies behind the common enemy and civil law views are widely divergent, modification based upon reasonableness may lead to similar results. Modification has meant that ". . . the civil-law owner may *never* drain his land *except* by following the natural drainage, but the common-enemy owner may *always* drain his land except that he may not use artificial channels. The civil-law owner may *never* obstruct the natural flow of surface waters *unless* he acts reasonably, while the common-enemy owner may always obstruct the flow *if* he acts reasonably." Maloney & Plager, "Diffused Surface Water: Scourge or Bounty?" 8 Natural Resources J. 72, 79 (1968).

In order to avoid the problems which resulted from either the common enemy or civil law rules, or the modified forms of these rules, many jurisdictions have adopted the reasonable use rule.

The doctrine of reasonable use is not the same as the reasonable use modification of the common enemy rule. The reasonableness modification rests on determinations of "negligence," "malice," and "good faith." Absent negligence, or an intentional injury, the common enemy or the civil law rule would be applied. The rule of reasonable use, however, does not rest on negligence, nor does it focus solely on the character of the property owner's action. Instead, it focuses on the results of the action, the consequent interference with another's use and enjoyment of his land—much like the nuisance branch of tort law. *Butler* v. *Bruno,* 115 R.I. 264, 341 A.2d 735 (1975).

The New Jersey Supreme Court in adopting the rule of reasonable use expressed it in this manner: ". . . each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable." *Armstrong* v. *Francis Corporation,* 20 N.J. 320, 327, 120 A.2d 4 (1956).

The jurisdictions which have adopted this principle have set forth varying tests for determining liability: (a) Is there a reasonable necessity for such drainage? (b) Has reasonable care been taken to avoid unnecessary injury to the land receiving the water? (c) Does the benefit accruing to the land drained reasonably outweigh the resulting harm? (d) When practicable, is the diversion accomplished by reasonably improving the normal and natural system of drainage, or if such a procedure is not practicable, has a reasonable and feasible artificial drainage system been installed? *Enderson* v. *Kelehan,* 226 Minn. 163, 32 N.W.2d 286 (1948).

This reasonable use approach has been adopted by the Restatement (Second), Torts, as well as many other jurisdictions.[1] The underlying policy is that an intrusion of surface water on one's property is much like any intrusion of smoke, fumes, or noise. Section 833 of the Restatement (Second), Torts provides: "An invasion of one's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water may constitute a nuisance under the rules stated in §§ 821A-831." The invasion can be either intentional, reckless or negligent. By way of illustration, the Restatement gives these examples: "1. The A Railroad Company owns and is in possession of a strip of land adjacent to land owned and occupied by B. There is a natural depression across both tracts of land through which surface waters from rain and melting snow are accustomed to flow from B's land onto and across A's land. A builds an embankment across this depression, leaving no opening, and as A realizes, the surface waters accumulating from the next hard rainfall cannot escape, spread out over B's land and damage his crops. This invasion of B's interest in the use and enjoyment of his land is intentional and A's liability for nuisance depends upon whether the invasion is unreasonable under the rules stated in

---

[1] See, e.g., *Weinberg v. Northern Alaska Development Corporation*, 384 P.2d 450 (Alaska 1963); *Rodrigues v. State*, 52 Hawaii 156, 472 P.2d 509 (1970); *Klutey v. Kentucky Department of Highways*, 428 S.W.2d 766 (Ky. 1968); *Tucker v. Badoian*, 376 Mass. 907, 384 N.E.2d 1195 (1978); *Armstrong v. Francis Corporation*, 20 N.J. 320, 120 A.2d 4 (1956); *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787 (1977); *Jones v. Boeing Co.*, 153 N.W.2d 897 (N.D. 1967); *Butler v. Bruno*, 115 R.I. 264, 341 A.2d 735 (1975); *Houston v. Renault, Inc.*, 431 S.W.2d 322 (Tex. 1968); *Sanford v. University of Utah*, 26 Utah 2d 285, 488 P.2d 741 (1971); *State v. Deetz*, 66 Wis. 2d 1, 224 N.W.2d 407 (1974).

§§ 826-831. On A's liability for trespass, see § 158. 2. The same facts as in Illustration 1, except that A puts a small culvert through its embankment to accommodate the surface waters that flow in the depression. After a hard, two-day rainfall, however, the flow of water in the depression is so great that the culvert cannot accommodate it, and as a result B's land is flooded and his crops are damaged. This invasion of B's interest in the use and enjoyment of his land is not intentional since it was not substantially certain to result from the acts of A, and A's liability therefore depends upon whether it was negligent in building so small a culvert." Restatement (Second), Torts § 833, p. 147.

An advantage of this rule is its flexibility. Current social policy dictates that a person no longer have unfettered control of his land. In an urbanized state such as Connecticut it would be unjust for a landowner to ignore the harmful consequences of his actions. The reasonable use rule permits the costs of land development to be allocated to the developer rather than the adjoining landowners.

While this rule does not offer the certainty which the previous Connecticut law offered, the "desire for certainty of liability should not and must not serve as a judicial pardon for the unreasonable conduct which has been manifested by any landowner in our modern society." *Butler* v. *Bruno,* supra, 275.

Although different courts have adopted various tests to determine what is a reasonable use of one's property; note, 2 W. New Eng. L. Rev. 549 (1980); annot., 93 A.L.R.3d 1193; the law of nuisance clearly involves the proper weighing analysis. Surface water invasions should not be treated any dif-

ferently from invasions of smoke, vibrations or noise. Courts are familiar with nuisance concepts and can easily apply the law of nuisance to surface water cases.

The plaintiff brought its suit on the basis of negligence. Under Connecticut law of negligent nuisance, the law imposes upon every property owner a duty to make reasonable use of his property so as to occasion no unnecessary damage or annoyance to his neighbor. The determination of reasonableness is essentially a weighing process, involving a comparative evaluation of conflicting interests. *Maykut* v. *Plasko,* 170 Conn. 310, 365 A.2d 1114 (1976). Surface water problems should be decided under Connecticut nuisance law, utilizing the Minnesota and New Jersey guidelines.

I would reverse and remand for a new trial.

In this opinion PARSKEY, J., concurs.

