BOARD OF TRANSPORTATION v. TERMINAL WAREHOUSE CORPORATION; PILOT FREIGHT CARRIERS, INC., LESSEE

No. 7828SC1015

(Filed 4 December 1979)

1. **Eminent Domain § 2.2— action to condemn portion of property—dead-ending of highway not compensable**

   In an action to condemn a small portion of defendant's property, the trial court did not err in refusing to instruct the jury that the dead-ending of a former U.S. highway abutting the front of defendant's property is a compensable damage item and in instructing the jury that the defendant is not entitled to compensation for any circuity of travel resulting from the dead-ending of the highway and that mere inconvenience caused by having to travel a circuitous route to and from the landowner's property does not constitute a taking, since the fact that a portion of defendant's property was taken does not render compensable those elements of damages which are ordinarily not compensable but are *damnum absque injuria.*

2. **Eminent Domain § 2.6; Waters and Watercourses § 1— highway condemnation action—change in surface water drainage—reasonable use rule**

   In an action to condemn a portion of defendant's property for use in a highway construction project, the trial court properly instructed the jury that the "reasonable use" rule governed the rights and liabilities of the parties with respect to changes in drainage of surface waters resulting from plaintiff's construction of the highway project.

   Judge MARTIN (Robert M.) concurring in part and dissenting in part.

APPEAL by defendant, Terminal Warehouse Corporation, from *Lewis, Judge.* Judgment entered 25 August 1978 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 21 August 1979.

This is a proceeding to condemn a .16 acre strip of land from a 2.85 acre tract owned by the defendant Terminal Warehouse Corporation and leased by it to Pilot Freight Carriers, Inc. The land was condemned as part of a project to relocate U.S. Highway 74 and to construct a portion of Interstate Highway 40 and its connectors near Asheville in Buncombe County. The only questions presented concern the elements which should properly be considered in determining the compensation to be paid the landowner.

Prior to the taking, U.S. Highway 74 was a two-lane paved highway which, in the area of the property taken, ran generally in a north-south direction and served as a major artery for traffic between Asheville and Charlotte. The 2.85 acre tract was a rectangular parcel of land having a frontage of 296 feet along the east margin of the highway and extending eastward from the highway to a depth of approximately 422 feet. Legal access to the highway was available along the entire 296 feet of frontage. A large brick and masonry building on the property served as a trucking terminal warehouse. Two gravel driveways leading from the highway, one on the north and the other on the south side of the building, afforded access for trucks to the loading docks on either side of the warehouse building and to the gravel parking area in the rear.

The .16 acre tract taken was a narrow triangular strip lying along the southern boundary of the 2.85 acre tract, fronting 38.84 feet on the east margin of U.S. Highway 74 and running back to a point at the southeast corner of defendant's property. All of the property taken was south of the southernmost gravel drive serving the warehouse building and a substantial portion of the condemned strip was covered by the stream bed of Gashes Creek, which flowed eastwardly across the southern portion of the 2.85 acre tract.

As part of the project for which defendant's property was taken, U.S. Highway 74 was relocated a substantial distance to the west so that since completion of the project one must travel

approximately one mile by connector road to reach relocated U.S. Highway 74 from defendant's property. The former U.S. Highway 74 on which defendant's property abuts is now a secondary road which terminates at a dead end opposite the southeast corner of defendant's remaining lot. At that point the road is completely blocked by an 80-foot high rock and earth fill which furnishes the roadbed for one of the connector roads to Interstate Highway 40. The secondary road (former U.S. Highway 74) remains open in front of and northward from defendant's property and provides access therefrom both to the relocated U.S. Highway 74 and to east and west connector roads to Interstate 40.

In connection with the Interstate 40 project, plaintiff developed and improved 105 acres (all of which was presumably acquired from other landowners) out of the total of 3950 acres contained in the watershed of Gashes Creek upstream from defendant's property. The .16 acre tract taken in this proceeding was used by plaintiff principally for a partial relocation of Gashes Creek. Prior to the taking this stream flowed eastward onto and across the southern portion of the 2.85 acre tract after passing under former U.S. Highway 74 through a triple eight-by-eight foot concrete box culvert. At that time the stream entered the 2.85 acre tract from the west and flowed eastward on a course roughly parallel with and slightly north of its southern boundary line until it approached the eastern or rear portion of the tract, where it turned northward, eventually to flow into the Swannanoa River some distance downstream from defendant's property. On completion of the project for which the .16 acre tract was taken, the course of Gashes Creek was changed so that, instead of flowing onto the tract from the west after passing under old U.S. Highway 74, it now flows northward onto the tract after passing through a large concrete box culvert running under Interstate 40 and its connector roads. At the mouth of this culvert and on the .16 acre tract, a curved concrete retaining wall was erected to divert the flow of the creek as it emerges from the culvert so as to turn the waters eastward into the old stream bed of the creek. A smaller 42″ corrugated iron culvert collects waters draining from the massive fill and from the surface of Interstate Highway 40 and its connectors and discharges these waters into the creek at a point immediately below the mouth of the culvert.

At the trial before a jury to determine compensation, defendant landowner presented evidence to show that at times of heavy rainfall occurring since construction of the project, water from Gashes Creek comes over the top of the concrete retaining wall which plaintiff erected at the mouth of the culvert and flows upon defendant's remaining land, hindering its use as a trucking terminal. Defendant's expert witness attributed this to the increased flow of water in Gashes Creek resulting from the more rapid run-off from the surface of Interstate 40 and its connectors, to the more rapid flow caused by the increased slope of the new culvert under Interstate 40, and to the change in direction of the stream as it approaches defendant's property. In rebuttal, plaintiff presented an expert witness who testified that the concrete retaining wall which plaintiff erected at the mouth of the culvert now affords defendant greater protection from water damage than existed prior to construction of the project and that, although the volume of water in Gashes Creek had been increased by the project, this was not the cause of any flooding upon defendant's property. In the opinion of plaintiff's expert such flooding as had occurred on defendant's property during periods of heavy rainfall was not caused by construction of the project upstream from defendant's land but by the backing up of water caused by an inadequate culvert on another landowner's property downstream from defendant's land.

Defendant's appraisers testified concerning their opinions as to the fair market value of defendant's entire 2.85 acre tract immediately prior to the taking as compared with the fair market value of the remainder after the taking and placed the diminution in value at figures between $32,300.00 and $50,000.00. These witnesses testified that in arriving at their opinions as to fair market value of the remainder after the taking they took into account, among other matters, the effect on market value of such factors as the change in status of the highway from a U.S. Highway to a secondary road, the dead-ending of the road, the circuity of travel caused thereby, and the flooding on the property caused by construction of the project. Plaintiff's appraiser testified that in his opinion the difference in fair market value of the entire 2.85 acre tract as compared with the value of the 2.69 acres remaining after the taking was $1,120.00.

The court submitted three issues to the jury, which answered them as follows:

1. What sum are the defendants, Terminal Warehouse Corporation, Pilot Freight Carriers, Inc., Lessee, entitled to recover as just compensation for the appropriation of a portion of their property for highway purposes on the 13th day of October, 1969?

ANSWER: $2000.00

2. Did the Board of Transportation unreasonably interfere with the flow of surface water, thereby causing damage to the property of the defendant, Terminal Warehouse?

ANSWER: No

3. What amount, if any, is the landowner, Terminal Warehouse, entitled to recover from the Board of Transportation for the unreasonable interference with the flow of surface water?

ANSWER: _____

From judgment in accord with the verdict, defendant landowner appeals.

*Attorney General Edmisten by Senior Deputy Attorney General R. Bruce White, Jr., and Assistant Attorney General Frank P. Graham for petitioner appellee.*

*Bennett, Kelly & Cagle, P.A. by Harold K. Bennett for defendant appellant.*

PARKER, Judge.

[1] Appellant assigns error to the court's refusal to instruct the jury as requested by it "[t]hat substantial interference with the property owner's access to U.S. Highway 74 was compensable" and "that the dead-ending of what formerly was U.S. 74 is a compensable damage item." Instead of giving the requested instructions, the court instructed the jury that the landowner was not entitled to compensation for any circuity of travel resulting from the dead-ending of the highway and that mere inconvenience

caused by having to travel a circuitous route to and from the landowner's property does not constitute a taking. We find no error in the refusal to give the requested instructions or in the instructions which were given in this case.

So long as he is still afforded reasonable access to the street or highway on which his property abuts, the landowner is not entitled to compensation because the dead-ending of that street or highway by action of the public authorities leaves his property on a *cul-de-sac. Wofford v. Highway Commission*, 263 N.C. 677, 140 S.E. 2d 376, cert. denied, 382 U.S. 822 (1965); *Snow v. Highway Commission*, 262 N.C. 169, 136 S.E. 2d 678 (1964). The landowner has no right to have the flow of traffic pass his property undiminished or to insist that it continue to flow in both directions, *Moses v. Highway Commission*, 261 N.C. 316, 134 S.E. 2d 664, cert. denied 379 U.S. 930 (1964), and the mere inconvenience resulting from circuity of travel required to get to and from his property is not compensable but is *damnum absque injuria*. The rationale behind this rule was explained in *Wofford v. Highway Commission, supra*, as follows:

> The landowner has an easement consisting of the right of reasonable access to the particular highway on which his land abuts. He has no constitutional right to have anyone pass by his premises at all; highways are built and maintained for public necessity, convenience and safety in travel and not for the enhancement of property along the route. An abutting landowner is not entitled to compensation because of circuity of travel to and from his property; such inconvenience is held to be no different in kind, but merely in degree, from that sustained by the general public, and is *damnum absque injuria* . . .
>
> * * *
>
> . . . Where a *cul-de-sac* is created, or the movement of traffic has been limited to one direction, the landowner's right to use the street is no more restricted than is that of other citizens making use thereof, and the landowner has no constitutional right to have others pass his premises. *Barnes v. Highway Commission*, 257 N.C. 507, 126 S.E. 2d 732. The restriction upon the landowner and the restriction upon the

public generally, in the use of the street for travel, is no different in kind, but merely in degree. A property owner is not entitled to compensation for mere circuity of travel. Absolute equality of convenience cannot be achieved, and those who purchase and occupy property in the proximity of public roads or streets do so with notice that they may be changed as demanded by the public interest.

263 N.C. at 680-81, 140 S.E. 2d at 379-80.

Appellant recognizes these principles but contends that they should not apply in a case such as is here presented where there has been an actual taking of a portion of the landowner's property. The measure of damages where only a part of a tract of land is taken for highway purposes is prescribed by statute, G.S. 136-112(1), as follows: "where only a part of a tract is taken, the measure of damages for said taking shall be the difference between the fair market value of the entire tract immediately prior to said taking and the fair market value of the remainder immediately after said taking, with consideration being given to any special or general benefits resulting from the utilization of the part taken for highway purposes." In applying this rule, "[t]he fair market value of the remainder immediately after the taking contemplates the project in its completed state and any damage to the remainder due to the user to which the part appropriated may, or probably will, be put." *Board of Transportation v. Brown*, 34 N.C. App. 266, 268, 237 S.E. 2d 854, 855 (1977), aff'd, 296 N.C. 250, 249 S.E. 2d 803 (1978). Proper application of these rules does not make compensable elements of damages to the landowner's remaining property which would not be compensable in the absence of any taking and which do not flow directly from the use to which the land taken is put. Such damages, if any, are shared by other property owners in the vicinity and occur without reference to whether any portion of the landowner's property has been condemned. In short, they do not result from the taking of a portion of the landowner's property. *See, Light Company v. Creasman*, 262 N.C. 390, 137 S.E. 2d 497 (1964); Annot., 59 A.L.R. 3d 488 (1974).

This precise question was addressed by the Supreme Court of Ohio in *Richley v. Jones*, 38 Ohio St. 2d 64, 310 N.E. 2d 236 (1974), in which it was held that the fact of taking does not make

compensable elements of damages which would otherwise be *damnum absque injuria*. In overruling decisions of the lower courts which had allowed compensation for such elements of damages where there had been a partial taking, the Supreme Court of Ohio reasoned as follows:

The problem arises when there is a partial appropriation and the owner is allowed to present evidence of the impaired condition of the land because of the appropriation. In such cases, some lower courts in the state have allowed evidence to be heard that would ordinarily pertain only to consequential damages, on the theory that such damages have become severance damages. *See, e.g., In re Appropriation for Hwy. Purposes* (1966), 6 Ohio App. 2d 6, 215 N.E. 2d 612.

The anomaly is well presented in *Columbus v. Farm Bureau Cooperative Assn.* (1971), 27 Ohio App. 2d 197, 200, 273 N.E. 2d 888, 890: "Thus, the issue before this court is whether damages consequential to the construction of an improvement, which would be *damnum absque injuria*, in the absence of the taking of any of a property owner's property, become compensable damages to the residue where a portion of the property of such property owner is taken for the improvement."

The problem then revolves around our theory of just compensation. We usually define "market value" as the amount of money that a purchaser willing, but not obliged, to buy the property would pay to an owner willing, but not obliged, to sell, taking into consideration the reasonable uses to which the land may be put. But the landowner cannot profit because the state is exercising its power of eminent domain. The landowner is entitled to no special damages because he is compelled to part with his title.

\* \* \*

The holdings in the lower courts in this cause have the effect of giving the landowner special damages. A neighbor who might have similar problems with traffic flow because of the construction of the median strip, but who has had no land taken by the state in connection with the project, will receive no recompense for whatever is done to his land. He has suf-

fered an "inconvenience shared in common with the general public," which is *damnum absque injuria.*

Here, appellees have suffered that same "inconvenience," differing possibly in degree but not in kind. The fact that this loss is coincident with an appropriation of land in no way changes the noncompensable character of the damage.

38 Ohio St. 2d at 69-70, 310 N.E. 2d at 240.

In the present case the small portion of defendant's property which was taken was located along the southern boundary of defendant's tract. No part of the .16 acre tract taken had even been used in connection with operation of the trucking terminal and much of it was covered by the stream bed of Gashes Creek. Thus, the use of defendant's remaining property as a trucking terminal was in no way impaired by the severance therefrom of the small strip taken. Access from defendant's remaining property to the abutting road as it now exists is exactly the same as it was before the taking. The record discloses that other tracts of land northward along the road from defendant's property are occupied by other trucking terminals. These tracts have been affected by the closing of the road south from defendant's property and by the relocation of U.S. Highway 74 in exactly the same way as has defendant's remaining tract. We see no sound reason why defendant should be entitled to compensation for elements of damages which, under *Wofford v. Highway Commission, supra,* would be denied to defendant's neighbors.

Defendant's reliance on the decision of this court in *Highway Comm. v. Yarborough,* 6 N.C. App. 294, 170 S.E. 2d 159 (1969), as support for the proposition that it is entitled to compensation for substantial interference with its easement of access, is misplaced. In that case the evidence disclosed that the highest and best use of the property was residential and that, as result of a deprivation of all direct access to the abutting highway, a new street would have to be constructed to open the area to residential development. The interference with the easement of access was direct, immediate, and unique to the condemnee. Here, there has been no interference with defendant's easement of access to the abutting road which, although not now a U.S. Highway, is still maintained as a secondary road running north from the property and which provides means of access to relocated Highway 74 at a

distance of approximately one mile from defendant's property. Under these circumstances defendant's access to Highway 74 has not been taken, and the trial court was correct when in effect it so instructed the jury. *See Highway Commission v. Nuckles*, 271 N.C. 1, 155 S.E. 2d 772 (1967).

[2] Defendant appellant also assigns error to the instructions given by the court as to the law governing the rights and liabilities of the parties with respect to changes in drainage of surface waters resulting from plaintiff's construction of the Interstate 40 project. In this connection the court instructed the jury in accordance with the "reasonable use rule" adopted by our Supreme Court in *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E. 2d 787 (1977). In assigning error to these instructions, appellant does not contend that the court erred in failing to state the "reasonable use rule" correctly. Rather, the appellant contends that the court erred in applying the rule at all in this case. Appellant argues that although the "reasonable use rule" applies when a private landowner is charged with wrongfully diverting the flow of surface waters to his neighbor's detriment, it should have no application in a case in which the state (or presumably any other body having the power of eminent domain) is so charged. In such a case, appellant contends, any damage caused by action of the body having the power of eminent domain constitutes a taking in the constitutional sense for which just compensation must be paid. We do not agree with appellant's contention that it was error to apply the "reasonable use rule" in this case.

In its opinion in *Pendergrast v. Aiken, supra*, our Supreme Court was careful to point out that adoption of the "reasonable use rule" was a clarification rather than an innovation in the law of this state. The Court noted that "[i]n the past, modifications in drainage water law have been piecemeal as required by time and circumstance" and that the Court's action in adopting the reasonable use rule "simply recognizes that fact and approves a rule by which adjustments in the rights and duties of landowners may be made fairly and justly without disrupting the consistency of the law." 293 N.C. at 218, 236 S.E. 2d at 798. We find nothing in the opinion which indicates that the Court did not intend the rule to apply in cases in which a condemning authority is involved. On the contrary, the Court expressly pointed out that the reasonable use rule "can be applied effectively, fairly and consistently in any

factual setting, . . . and thus has the capacity to accommodate changing social needs without occasioning the unpredictable disruptions in the law associated with our civil law rule." 293 N.C. at 216, 236 S.E. 2d at 796. The changing social needs to which the Court referred frequently require the exercise of the power of eminent domain, and a number of the cases cited by the Court in the course of its analysis of the modifications which prior decisions in this state had already effected in the strict civil law rule arose out of disputes in which bodies having the power of eminent domain were involved. *See, e.g., Yowmans v. Hendersonville*, 175 N.C. 574, 96 S.E. 45 (1918); *Dunlap v. Light Co.*, 212 N.C. 814, 195 S.E. 43 (1938); *Midgett v. Highway Commission*, 260 N.C. 241, 132 S.E. 2d 599 (1963); *City of Kings Mountain v. Goforth*, 283 N.C. 316, 196 S.E. 2d 231 (1973). We note particularly that the Court in *Pendergrast*, after citing and quoting from *Dunlap v. Power Co. supra*, a case which involved a party having the power of eminent domain, pointed out that it had already "adopted a flexible rule of reasonable use with regard to the rights and duties of riparian owners where such a position was mandated by basic long-term change in the social and economic structure of society." 293 N.C. at 214, 236 S.E. 2d at 795. Finally, we note the following admonition from the opinion in *Pendergrast* which seems particularly applicable to a case involving a party having the power of eminent domain:

> We emphasize that, even should alteration of the water flow by the defendant be "reasonable" in the sense that the social utility arising from the alteration outweighs the harm to the plaintiff, defendant may nevertheless be liable for damages for a private nuisance "if the resulting interference with another's use and enjoyment of land is greater than it is reasonable to require the other to bear under the circumstances without compensation." *See* Restatement (Second) of Torts (Tent. Draft No. 17, 1971); Restatement (Second) of Torts §§ 826, 829A (Tent. Draft No. 18, 1972). The gravity of the harm may be found to be so significant that it requires compensation regardless of the utility of the conduct of the defendant.

293 N.C. at 217-18, 236 S.E. 2d at 797. The trial judge in the present case was careful to instruct the jury in accord with this admonition.

In holding that the trial court in the present case was correct in instructing the jury that the rights of the parties were governed by the reasonable use rule, we are not inadvertent to the expressions in some pre-*Pendergrast* cases in which our Supreme Court spoke in terms of the rights of upper and lower proprietors with regard to the control and use of surface waters as being property rights the invasion of which by a party having the power of eminent domain would amount to a taking, *see, e.g., City of Kings Mountain v. Goforth, supra*, at 325, 196 S.E. 2d at 238, nor do we overlook similar expressions in cases from other jurisdictions, *see*, Annot., 128 A.L.R. 1195, 1198 (1940). We do not, however, view these cases as determinative of the question now before us. As we view the matter, the question presented by the present case is not whether the landowner is entitled to be fairly compensated for damages caused by any invasion of its rights with respect to the flow of surface waters which may have been caused by plaintiff's construction of the Interstate 40 project, a point which may be readily conceded. Rather, the question presented by this appeal is what rule should be applied by the court and jury in determining whether, and to what extent, the landowner's rights have been invaded. In our opinion, and we so hold, the trial court was correct in instructing the jury to apply the reasonable use rule as enunciated in *Pendergrast* in making that determination.

The appellant has also brought forward assignments of error directed to the court's actions in admitting and excluding certain testimony. We have carefully considered these assignments of error and find no prejudicial error which warrants the granting of a new trial.

No error.

Judge WEBB concurs.

Judge MARTIN (Robert M.), concurs in part and dissents in part.

Judge MARTIN (Robert M.), dissenting.

I dissent from that portion of the majority's opinion which approves the trial court's instructions to the jury on the

"reasonable use rule." Plaintiff's evidence tended to show that there had been no change in the handling of surface waters as the result of the taking; that any water damage which occurred was not the result of the highway construction, but rather of the backing up of the Swannanoa River downstream or of the backing up of water from an inferior privately constructed culvert located on adjoining lands. The landowner's evidence, on the other hand, tended to show that the culverting was the cause of flooding and silting on the property remaining after the taking. The jury was instructed that the State would be liable for damages to the landowner for its handling of the surface waters only if its use was unreasonable, or even if reasonable, if the interference with the use of the remaining land was greater than it was reasonable for defendant-appellant to bear. While this is a correct statement of the law with respect to actions between private landowners, I would hold that the "reasonable use rule" of *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E. 2d 787 (1977) is inapplicable to condemnation actions in which the issue is the determination of damages rather than liability.

In determining the fair market value of the remaining land where there has been a partial taking, as appears in this case, the landowner is entitled to compensation for injuries accruing to the residue from the taking, which includes damage resulting from the condemnor's use of the appropriated portion. *Light Co. v. Creasman*, 262 N.C. 390, 137 S.E. 2d 497 (1964); *Board of Transportation v. Brown*, 34 N.C. App. 266, 237 S.E. 2d 854 (1977), aff'd *per curiam* 296 N.C. 250, 249 S.E. 2d 803 (1978). "The landowner who has a part of his tract taken has the burden of proving by competent evidence . . . how the use of the land taken results in damage to the remainder." *Brown, supra* at 269, 237 S.E. 2d at 856. In the present case, by instructing the jury that recovery was warranted only if the damage caused to the remaining property was the result of *unreasonable* use of the surface water, the trial court placed an undue burden on the landowner. The action in *Pendergrast*, relied upon by the majority, was between private landowners, and the Supreme Court analyzed the issue of liability in terms of the law of nuisance. "Analytically, a cause of action for unreasonable interference with the flow of surface water causing substantial damage is a private nuisance action, . . ." *Id.* at 216, 236 S.E. 2d at 796. Although not expressly so holding, the

court in *Pendergrast* implied that the "reasonable use" rule was henceforth to be applied to governmental authorities in inverse condemnation actions. Assuming *arguendo* that it is so applicable, it does not necessarily follow that it is applicable in formal condemnation proceedings. The essential inquiry in an inverse condemnation action is whether there has been a taking in fact, although formal condemnation proceedings have not been instituted. *Charlotte v. Spratt*, 263 N.C. 656, 140 S.E. 2d 341 (1965). That is, the jury must determine whether *liability* exists. In a formal condemnation action such as is involved here, the issue for determination by the jury is not liability, but rather, damages. Prior to the decision in *Pendergrast*, the law was clear that a condemnee was entitled to have the jury consider as an element of compensation water damage resulting from the taking of a portion of a tract of land and its use for the diversion of surface waters. *See, Highway Commission v. Phillips*, 267 N.C. 369, 148 S.E. 2d 282 (1966); *Highway Commission v. Yarborough*, 6 N.C. App. 294, 170 S.E. 2d 159 (1967). The proper inquiry for the jury here should not have been whether the State's use of the surface waters was so unreasonable as to constitute a taking, but rather, given the fact of a physical taking, whether the water damage was the *result* of the State's use of the land taken. *See Brown, supra.*

For the reasons stated, I would reverse the trial court and remand for new trial on the issue of the State's handling of the waters of Gashes Creek.